35 So.2d 375

## SINGLETON v. STATE.

### I Div. 562.

Court of Appeals of Alabama.

May 11, 1948.

C. B. Gillmore and T. Watrous Garrett, both of Grove Hill, for appellant.

A. A. Carmichael, Atty. Gen., and L. E. Barton, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

The appellant was indicted for murder in the first degree. Her jury trial resulted in a verdict of guilty of murder in the second degree, her punishment being fixed at imprisonment in the penitentiary for a term of twenty years.

No motion for a new trial was filed.

The prosecution below revolved around the discovery of the body of a new born baby.

On a Monday morning in January, 1946, the body of a new born Negro male infant was found in or near the white cemetery in Jackson, Alabama. The child had been born within the previous twenty-four hours. Adhering to the body was a section of newspaper, The Mobile Press Register, in which the body had been wrapped. Dogs had nosed the body and dragged it around, and the feet and part of the legs had been roughly amputated, apparently through the action of dogs or other animals. There was also a severe gash in the abdomen resulting probably when the body was thrown across a wire fence, but according to the medical testimony of the State all of the wounds on the body were post mortem except a few very superficial wounds on the head which in no way contributed to the death of the infant. Actually, therefore, the wounds on the body contribute nothing toward directing a conclusion in this case.

On the Wednesday following the Monday on which the infant's body was found two officers, after first securing a search warrant, searched the appellant's home, which was in a settlement about a quarter of a mile from where the body had been found. In appellant's home they found a part of the Mobile Press Register of the same date as the portion of the newspaper found adhering to the infant's body. Both officers had however misplaced their notes concerning this piece of evidence and the record is not clear as to whether the news-

paper found in the house was a part or section of paper with which the body was wrapped.

These officers also found that a mattress on one of the beds had a damp area which appeared to have been made by blood, and that this fluid had soaked completely through the mattress.

On the Wednesday that the officers searched the appellant's home she was contacted by them and told to report to the City Hall in Jackson at 2 o'clock that afternoon for a physical examination.

The appellant did report and voluntarily submitted to being physically examined by Dr. Leiland Chapman, a qualified physician of some eighteen years of practice.

Dr. Chapman testified that the appellant stated to him that she had not recently had a baby.

His manual pelvic examination of appellant disclosed that her uterus was enlarged an estimated ten per cent, and that there was a mucous discharge present, but with absolutely no bleeding. He further found that her abdominal muscles were flaccid, a condition usually found after delivery of a baby.

It was Dr. Chapman's opinion that the appellant had given birth to a child within three or four days preceding his examination.

On cross examination Dr. Chapman testified that other than the pelvic examination he did not further examine the appellant; that is he did not examine her breasts for enlargement or tenderness, did not take her temperature, and had no laboratory tests made. That while normally there is post natal bleeding or discharge for nine or ten days, it is possible for a woman to give birth to a child without such post natal discharge.

Dr. Chapman had also examined the body of the infant. We have already set forth the condition of the body and see no reason for further discussion of this phase of Dr. Chapman's testimony other than to add that Dr. Chapman stated the baby's umbilical cord was 8 to 10 inches long and appeared to have been twisted off.

On direct examination Dr. Chapman stated he did not know what had caused the baby's death. However, on re-direct examination Dr. Chapman stated he did not think the baby had died from exposure, and then stated, "If that umbilical cord was not ligated it would have died from hemorrhage, and it was not ligated." In answer to the court's inquiry Dr. Chapman said that by stating the cord had not been ligated he meant it had not been tied.

Dr. Chapman further testified that it was possible for a woman to give birth to a child one night and report for and carry on her work the next morning.

Mr. Nelson Grubbs, a State Toxicologist, testified that he had performed a post mortem examination on the body of the infant. The significant portion of Mr. Grubb's testimony is that he removed the lungs from the body and placed them in water, a procedure known as a hydrostatic test, and by this means determined that the child had breathed.

On cross examination Mr. Grubbs testified that it is possible for a baby to take air into the lungs during the process of birth and before its delivery is complete, and further that a baby might inhale air into its lungs upon delivery and die almost immediately. He had no idea as to how long this infant had lived, nor did he know the cause of its death.

On the afternoon that the appellant was examined by Dr. Chapman she was later placed in jail. There she was questioned by the two officers who had searched her home. Mr. Joe Graham, one of these officers, testified as follows concerning certain statements made to him and the other officer by the appellant:

"Q. What did she say to you, Mr. Graham? A. We went to talk to her after Mr. McMullen and I had visited the place she lived in Jackson. We talked to her about the condition of that bed and she told us that she had had a baby on that bed on the Sunday night before that and we asked her who was there and she said no one other than her two children, but she put them in the corner room on that bed.

"Q. What did she say she did with the body of the baby, if anything? A. She said she took it the next morning on the way to work and pitched it over the fence at the cemetery.

"Q. Did she tell you what she put around the body of the baby? A. I don't remember that she did."

Concerning these statements by the appellant, Mr. Sid McVay, the other officer, testified as follows:

"Q. Go ahead, what did she say? A. That was in jail.

"Q. Yes, sir. A. Joe Graham and I went in there and asked her about it and she said that she had this child and she has two other children and said she put them in the other room on the bed that night away from her.

\*      \*      \*      \*      \*      \*

"Q. As a matter of fact, Mr. McVay, she made several conflicting statements to you about this thing after you put her in jail? A. She did.

"Q. The one you testified about is that the one she first made? A. No, sir, the first one she made was when we put her in jail. She made the statement, she said, 'I just as well own up to all of it. I am guilty.' Then we called Jackson. They were still searching for evidence. We called Jackson and told them what she said.

\*      \*      \*      \*      \*      \*

"Q. What else did she tell you about it while she was there in jail, about what had happened? A. I don't recall, Clifton. She confessed to it twice and then denied it and different things until I got to where I quit talking with her."

The State also introduced as witnesses two Negro women, mother and daughter, who lived close to appellant and often observed her as she went to and from her work. These two witnesses stated that for some time prior to the finding of the body of the infant the appellant showed physical signs of being pregnant, and that when seen by them after the body of the infant had been found the appellant's body and figure had resumed its normal shape and form.

For the defense evidence was introduced directed toward showing that the appellant had operated a small cafe for a long number of months prior to the discovery of the dead body of the infant.

Some thirteen witnesses, acquaintances of the appellant and patrons of her cafe, testified that at no time during the months preceding the finding of the dead infant did the appellant have any indicia of pregnancy. Many of these witnesses were frequently in her cafe, or otherwise regularly associated with her. Appellant usually wore slacks while at work in her cafe, and was seen by several of these witnesses as late as the Saturday night before the finding of the infant's body the following Monday.

As a witness in her own behalf the appellant, Irene Singleton, testified that she was the mother of two children, born of a union with a man named Miller with whom she had lived for a number of years prior to their separation about four years ago. The appellant strenuously denied that she had been pregnant or had given birth to a child since the birth of her youngest child several years ago.

She further testified that she had worked in her cafe daily during the months that the State witnesses alleged she was pregnant, and had in fact worked in the cafe all day Sunday preceding the Monday on which the infant's body was discovered, and until late that night, and the following Monday. Several other defense witnesses corroborated the appellant in this phase of her testimony.

The appellant further stated that she was not asked by Dr. Chapman at the time she was examined by him if she had given birth to a baby.

As to the statements made by her to the officers the appellant contended that she had never been in jail before, and that she was distraught over this and the separation from her children to the extent that she does not remember what she may have said during this time.

She alleged that the two women who had testified for the State that they had observed physical signs on her indicating she was pregnant were unfriendly toward

her and that she was not on speaking terms with either of them.

A number of witnesses testified as to the appellant's good character, and along this line further evidence was introduced directed toward showing that the appellant supported and cared for her two children to the best of her ability, and was in every way an affectionate and dutiful mother.

The paramount question raised in this case is the sufficiency of the evidence to establish the corpus delicti.

Appellant's counsel first strenuously argues that the State has failed to meet its burden in establishing to the required degree that appellant gave birth to a child at the time pertinent to this inquiry. In our opinion this assertion is untenable in view of the evidence above outlined, disregarding the alleged admissions made by appellant.

The next point made by appellant's counsel attacks the sufficiency of the evidence to establish that the child, if born to appellant, was born alive and had an existence separate from its mother.

In infanticide cases an element additional to the required elements of the usual homicide case must be established by the State beyond a reasonable doubt, namely that the deceased babe was born alive, it being axiomatic that one cannot kill something already dead. Rough and rule of thumb tests were applied by the earlier cases, and the question of the viability of the child seems to have revolved around whether the child breathed and had a circulation independent of its mother. See Shedd v. State, 178 Ga. 653, 173 S.E. 847; Epps v. State, 149 Ga. 484, 100 S.E. 568; Harris v. State, 28 Tex.App. 308, 12 S.W. 1102, 19 Am.St.Rep. 837; Harris v. State, 30 Tex.App. 549, 17 S.W. 1110; Josef v. State, 34 Tex.Crim.R. 446, 30 S.W. 1067; People v. York, 262 Ill. 620, 105 N.E. 35; People v. Staples, 149 Cal. 405, 86 P. 886; State v. O'Neall, 79 S.C. 571, 60 S.E. 1121; Taylor v. State, 108 Miss. 18, 66 So. 321; Jackson v. Commonwealth, 265 Ky. 295, 96 S.W.2d 1014; Morgan v. State, 148 Tenn. 417, 256 S.W. 433.

Some of the cases dealing with infanticide, erring it is true because of the inherent humaneness of the common law, have been blinded by overzealous charity to the extent that all reasonable inferences to be gathered from the evidence are ignored and the State is required to prove that the baby was born alive beyond any possible doubt rather than beyond all reasonable doubt.

It was early established that proof that the child had breathed was insufficient to prove that it had lived, as a child often breathes during the process of its birth and prior to complete delivery. See Cyc. of Law and Proc., Vol. 21, p. 663, and cases there cited. The earlier cases also required a complete separation of the infant from the mother and the establishment of an independent circulatory existence. In the relatively later cases it has been held however that severance of the umbilical cord is not requisite to establish such condition.

The desired and rational view as to the burden placed on the State in proving that the deceased child was born alive is reflected in an enlightened opinion by the District Court of Appeal of California, Fourth District, in People v. Chavez, 77 Cal.App.2d 621, 176 P.2d 92, 94, wherein Barnard, P. J., after reviewing the common law doctrines developed by the decisions in England and this country as to the question now being considered wrote:

"Beyond question, it is a difficult thing to draw a line and lay down a fixed general rule as to the precise time at which an unborn infant, or one in the process of being born, becomes a human being in the technical sense. There is not much change in the child itself between a moment before and a moment after its expulsion from the body of its mother, and normally, while still dependent upon its mother, the child, for some time before it is born, has not only the possibility but a strong probability of an ability to live an independent life. It is well known that a baby may live and grow when removed from the body of its dead mother by a Caesarian operation. The mere removal of the baby in such a case or its birth in a normal case does not, of itself and alone, create a human being. While before birth or removal it is in a sense dependent upon its mother for life,

there is another sense in which it has started an independent existence after it has reached a state of development where it is capable of living and where it will, in the normal course of nature and with ordinary care, continue to live and grow as a separate being. While it may not be possible to draw an exact line applicable to all cases, the rules of law should recognize and make some attempt to follow the natural and scientific facts to which they relate. As Judge Cardozo once said: 'Let the facts be known as they are, and the law will sprout from the seed and turn its branches toward the light.' There is no sound reason why an infant should not be considered a human being when born or removed from the body of its mother, when it has reached that stage of development where it is capable of living an independent life as a separate being, and where in the natural course of events it will so live if given normal and reasonable care. It should equally be held that a viable child in the process of being born is a human being within the meaning of the homicide statutes, whether or not the process has been fully completed. It should at least be considered a human being where it is a living baby and where in the natural course of events a birth which is already started would naturally be successfully completed. While the question of whether death by criminal means has resulted while the process of birth was being carried out, or shortly thereafter, may present difficult questions of fact, those questions should be met and decided on the basis of whether or not a living baby with the natural possibility and probability of growth and development was being born, rather than on any hard and fast technical rule establishing a legal fiction that the infant being born was not a human being because some part of the process of birth had not been fully completed.

"The question presented has not been decided in this state. Section 192 of the Penal Code provides: 'Manslaughter is the unlawful killing of a human being, without malice * * *.' In Scott v. McPheeters, 33 Cal.App.2d 629, 92 P.2d 678, 93 P.2d 562, it was pointed out that the theory under another statute that an unborn child is a human being separate and distinct from its mother is something more than a fiction and is based upon scientific fact, common experience and knowledge. In fact, it would be a mere fiction to hold that a child is not a human being because the process of birth has not been fully completed, when it has reached that state of viability when the destruction of the life of its mother would not end its existence and when, if separated from the mother naturally or by artificial means, it will live and grow in the normal manner. In practical effect, the rules that have developed at common law furnish a presumption that the baby in question is, or will be, born dead. This presumption is not only contrary to common experience and the ordinary course of nature, but it is contrary to the usual rule with respect to presumptions followed in this state. Section 1963 (28) of the Code of Civil Procedure provides that, while it may be disputed, it is to be presumed 'That things have happened according to the ordinary course of nature and the ordinary habits of life.' While this presumption may not be sufficient for every purpose it is not only some evidence, but it suggests the proper manner of approach in considering all of the evidence."

The views expressed above by the California Court of Appeal in our opinion present a logical approach and invite a rational conclusion to determining the viability of a new born child. Adopting such view it is our conclusion that the State met the burden of proof cast upon it to establish that the infant in the present case was born alive.

We now come to consider the basic and fundamental elements usually arising in determining the sufficiency of the proof of the corpus delicti. Not only must the State establish by the required proof the fact of the death of the infant, but also that a criminal agency caused the death.

Circumstantial evidence may afford satisfactory proof of the corpus delicti, and it is the settled doctrine of this State that inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or

confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances standing alone, would not satisfy the jury of the existence of the corpus delicti. Hill v. State, 207 Ala. 444, 93 So. 460. As we understand this doctrine, while extra judicial confessions may thus add sufficient weight to other inconclusive evidence and justify a jury's verdict of guilty, when without such admissions the evidence would not be sufficient to support a judgment, yet the State must, independent of such admissions establish prima facie the corpus delicti, which of course includes the criminal agency causing the crime. Thus viewed the above doctrine in nowise conflicts with the basic principle that an accused's confession is not admissible until the corpus delicti has been proved. Pierson v. State, 16 Ala.App. 197, 76 So. 487; Caraway v. State, 20 Ala.App. 362, 101 So. 912; Young v. State, 22 Ala.App. 436, 116 So. 507; Morris v. State, 23 Ala.App. 255, 123 So. 280.

■ Mr. Grubbs, the State Toxicologist, testified that from his tests he concluded that the baby in this case had breathed. As to the cause of its death he had no opinion. Dr. Chapman's testimony can only be interpreted to mean that the baby died from hemorrhage resulting from non ligation of the umbilical cord.

Thus the sum total of the evidence presented by the State as to the cause of this infant's death, insofar as this appellant is concerned, is that she may have been guilty of non-feasance in failing to tie the severed umbilical cord of her just delivered baby. Certainly there is not one scintilla of evidence indicating any positive wrongful acts on her part.

True, the principle is well settled that where a duty grows out of a close relationship, such as parent and child, then nonfeasance on the part of one so obligated which results in the death of the one to whom such duty is owed may well amount to manslaughter, or possibly even murder. Cases enunciating the above principles have chiefly arisen where the parent has failed to secure medical aid for a sick child, or has permitted such child to die from starvation, or exposure. Pallis v. State, 123 Ala. 12, 26 So. 339, 82 Am.St. Rep. 106; 40 C.J.S., Homicide, § 63.

Our research has however not uncovered any case where a court has been willing to hold that non-feasance of a mother in the throes of childbirth or its immediate aftermath, resulting in death to the new born babe, should be considered of sufficient criminality to sustain a homicide conviction growing out of the death of the child.

Clearly there is a vast difference between the studied non-feasance of a parent failing to call medical aid for a sick child, and the non-feasance present in omissions by an unattended mother beset with the pangs and travail of childbirth. The possibility and probability that maternal nonfeasance under the latter conditions springs from ignorance, pain, or physical incapacity is too great to permit the inference of constructive criminal intent.

The rigid requirements of the earlier cases as to proof of the viability of the child we think represent a groping recognition of the dangers inherent in a nonliberal approach to the doubtful question of the mother's criminality in such cases. Tables of infant mortality during birth bespeak the natural dangers accompanying and besetting the delivery of a child even when attended by skilled obstetricians and under the most favorable conditions.

This court in Weaver v. State, 24 Ala. App. 208, 132 So. 706, 707, had under consideration a case wherein the husband of the mother of a deceased new born babe had been convicted of murder in the second degree because of the death of the infant. The evidence showed that the husband had returned to his home about forty minutes after his wife, unattended, had given birth to a baby. Exhausted by the birth the mother had pulled the cord in two, but had been unable to attend to the baby and it lay in the blood, water, and afterbirth until the arrival of her husband. She informed her husband that she had had a miscarriage, and folding the sheet over the baby, fluid, and afterbirth, told him to bury it. The husband took the sheet and contents and disposed of it by throwing it in a toilet. There was expert

medical testimony by doctors who later examined the body that the child had been born alive. In holding that the State had failed to establish the corpus delicti this court, through Samford, J., wrote: "The whole gruesome sordid details of the birth and disposition of the babe was before the jury, all of which was calculated to prejudice the minds of the jury in favor of a conviction. But granting that the child's lungs were partially inflated with air and this condition could only have come about after birth, and assuming even that the defendant knew that what he dumped into the toilet along with the afterbirth and shoe box was a baby recently born, there is no evidence tending to prove that this defendant ever saw the baby alive, or that it was alive when defendant carried it out of the house, *nor is there any evidence that the baby came to its death by the hand of defendant or any other person.*" (Italics ours).

The underlined portion of the above quoted opinion, although dictum, clearly reflects that this court is unwilling to attach criminality to non-feasant acts of a mother resulting during the travail of childbirth even though such non action result in the death of the baby. Particularly is such view correct where, as in this case the mother is ignorant, uneducated, and unattended.

We are clear to the conclusion therefore that the State has failed to meet to the required degree the burden of establishing that this infant's death was caused by the criminal agency of this appellant. The State has therefore failed to prove the corpus delicti, without which no conviction can stand.

Having reached this conclusion it necessarily follows that it is our opinion that the lower court erred in overruling the appellant's timely and well grounded objections interposed to the questions relative to the admissions made by her, and also that the lower court erred in refusing the affirmative charge requested in writing by the appellant.

In our opinion the broader aspects of this case require its reversal. We therefore have not written to points raised by counsel for appellant in brief and argument pertaining to certain rulings on the admission of evidence, but reserve further consideration of such points.

It being our opinion that the State has failed to establish proof of the corpus delicti, it is ordered that the judgment of the lower court be reversed, and the cause rendered. It is further ordered that the defendant be discharged.

Reversed and rendered.

CARR, J., concurs that this judgment should be reversed, but remanded and not rendered.