## Richmond

GERTRUDE JACQUELINE VAUGHAN

v.

COMMONWEALTH OF VIRGINIA

No. 1470-86-2

Decided February 7, 1989

COUNSEL

Louis A. Rosenstock, III (Hill, Rainey & Rosenstock, on briefs), for appellant.

Birdie H. Jamison, Assistant Attorney General (Mary Sue Terry, Attorney General, W. Mark Dunn, Assistant Attorney General, on brief), for appellee.

OPINION

BENTON, J.—Gertrude Jacqueline Vaughan, a minor, was convicted by a jury of first degree murder of her newborn baby and was sentenced to an indeterminate commitment pursuant to Code § 19.2-311. The issues presented on this appeal are (1) whether Vaughan owed a legal duty of care to the newborn baby and if so, (2) whether there was sufficient evidence to demonstrate that her neglect of the baby arose from malicious, willful, deliberate and premeditated intent to kill the baby. We conclude that although the facts demonstrate that Vaughan had a legal duty to provide postpartum care for the baby, the evidence presented in this case was insufficient to show that Vaughan's omission to act was malicious, willful, deliberate, or premeditated.

On November 1, 1985, at age sixteen, Vaughan gave birth to her first child. Vaughan testified that the only medical advice or attention she received during her pregnancy occurred when she visited a doctor who informed her that she was approximately two months pregnant. Vaughan also testified that she had a sex education course in elementary school which covered the anatomy of bodies and sexually transmitted diseases but not the intricacies of pregnancy or childbirth. Vaughan, whose parents are divorced, normally confided in no one and did not tell her father, with whom she lived, or her mother about her pregnancy. She confided her pregnancy only to a girlfriend and to her boyfriend, the father of the baby. Although the father of the baby wanted her to have an abortion, she stated that she had waited too long before making a final decision and testified that she was planning to place the baby for adoption.

Vaughan began to experience severe cramps the day before the birth, and although she knew cramps were normally associated with pregnancy, she stated that she did not associate the pain with birth labor. The pain increased around 1:00 a.m., November 1. Later that morning, Vaughan told her father before he left for work that her stomach hurt too badly to go to school. He said that he would return home later to bring medicine. The birth occurred

at approximately 9:30 a.m. while Vaughan was alone at home, seated on the toilet. Vaughan testified that the baby landed in the toilet and immediately started to cry. She testified that she did not have to cut the umbilical cord because the baby was not "connected" to her when the child fell into the toilet. She put the baby on the floor on top of a paper bag. The infant continued to cry and move for approximately two minutes and then stopped. Vaughan said that immediately after placing the baby on the floor, she stood over the toilet because "some . . . gray-like portion came out in the toilet stool afterward" and "blood . . . was coming out rather fast."

Vaughan testified that it did not occur to her at that time that anything needed to be done for the infant. Vaughan stated that she "felt funny and didn't want to look at the baby." When the bleeding stopped, Vaughan cleaned herself and the bathroom while the infant laid uncovered on the floor. Feeling sleepy and flushed, she went to another room to watch television and fell asleep. Sometime during the day her father returned briefly to give her some medicine. Vaughan testified that she did not have any thoughts about the baby during that afternoon. After Vaughan awakened, she placed the baby inside several bags, one of which she had borrowed from a neighbor. At 5:00 p.m., she walked to the bus station and put the baby in a dumpster, where he was discovered the following day. Later, Vaughan consulted a physician to stop her milk flow.

Vaughan's neighbor testified that Vaughan came to her house during the afternoon of November 1, 1985, and asked for a paper bag. Vaughan stayed about ten to fifteen minutes, appeared to be behaving normally, and laughed and talked about school with her neighbor's granddaughter.

William Desmond, a clinical psychologist, testified for the defense. Desmond's psychological evaluation of Vaughan indicated in part "that the defendant's comprehension of events was impaired as a result of functional psychosis, major organic impairment, impairment resulting from prolonged drug or alcohol use, or mental retardation." Desmond testified that Vaughan dealt with her pregnancy "by denying and keeping the fact that she was pregnant as far from her awareness as possible." The trial judge asked Desmond if his opinion was based in part on the fact Vaughan did not tell anyone about her pregnancy. Desmond an-

swered affirmatively, and upon further inquiry by the court, revealed that he did not know that Vaughan had told her girlfriend about the pregnancy. Desmond also stressed that because Vaughan had not returned to a physician after the initial visit, she had no preparation for birth. He testified that the stress she experienced during almost twenty four hours of labor and childbirth rendered her incapable of rational decision making when the baby was born.

William M. Lee, a clinical psychologist employed by Central State Hospital, examined Vaughan and testified for the Commonwealth. Relying in part upon Vaughan's recollection that she was "shocked or upset," Lee found "evidence . . . that the stressful event was consciously perceived." He therefore found no evidence of any dissociative reaction involving an interruption in Vaughan's stream of consciousness or awareness. Although Lee found Vaughan to be "psychosocially immature or somewhat naive or unsophisticated," he also stated that he believed Vaughan was capable of making a rational decision when the baby was born and that she was aware that she was about to give birth.

Dr. Gary W. Ross, the medical examiner, testified that the baby was a normally developed male who had no injuries. There was air in the baby's lungs, which indicated either a live birth or resuscitation at the time of birth. Ross was unable to give a specific estimate of how long the baby had lived; he stated that the baby could have died a few minutes after birth or up to a few hours after birth. When asked, "Doctor, is it possible that the baby may have lived only a matter of minutes rather than possibly hours?" he responded, "Oh, yes, that's perfectly consistent with what we've found. Yes." Ross identified the cause of death as being "inattention at birth." He further explained that inattention at birth encompasses three major categories: (1) hypothermia (lack of warmth); (2) bleeding from an unclamped umbilical cord; and (3) lack of a clean air passage. Ross testified that he could not state that all three factors had caused the baby's death, but he assumed that one of these factors caused death due to a lack of evidence that death was caused by other factors. He further testified that the presence of meconium staining on the baby's body indicated unusual stress or "that something may have been wrong during the delivery process." Finally, he testified that the baby did not die as a result of drowning.

Although it is well settled that parents have a legal duty to provide necessary care for their children, Code § 18.2-371.1; *Biddle v. Commonwealth*, 206 Va. 14, 21, 141 S.E.2d 710, 715 (1965), the precise question raised in this appeal whether the legal duty of a mother to care for her child attaches under certain circumstances attendant during childbirth appears to be a case of first impression in Virginia. Vaughan, citing *State v. Osmus*, 73 Wyo. 183, 276 P.2d 469 (1954), submits that the law should not impose a duty upon her to have cared for her newborn child immediately after childbirth. Such a legal duty, argues Vaughan, represents an unfair burden given the circumstances of her inexperience, her shock immediately after giving birth, and the brevity of the child's life. In *State v. Osmus*, the Wyoming Supreme Court quoted with approval the following passage from *Singleton v. State*, 33 Ala. App. 536, 542, 35 So. 2d 375, 380 (1948):

> Clearly there is a vast difference between the studied nonfeasance of a parent failing to call medical aid for a sick child, and the non-feasance present in omissions by an unattended mother beset with the pangs and travail of childbirth. The possibility and probability that maternal non-feasance under the latter conditions springs from ignorance, pain, or physical incapacity is too great to permit the inference of constructive criminal intent.

73 Wyo. at 209-10, 276 P.2d at 479.

■ Sensitivity to the capabilities of a sixteen year old girl who has recently endured an unattended childbirth, however, does not require a conclusion that a mother owes no duty of care to her newborn child. Such a conclusion is not necessary to assuage the concerns articulated by the court in *Osmus*. Recognition that a legal duty exists will not prevent consideration of a mother's physical or mental capabilities in assessing her willfulness, malice, deliberation, premeditation, or degree of negligence in failing to care for her baby. We therefore hold that although a court may consider the mother's condition in determining the degree of criminal culpability, if any, arising from a failure to attend to her newborn baby, the sole fact that she has recently experienced childbirth does not excuse her from a legal duty to care for the baby.

Vaughan next contends that even if she had a duty to care for the baby, the evidence presented in this case was insufficient to

prove that her failure to provide care was a malicious, willful, deliberate and premeditated omission intended to cause death. Although Vaughan's own testimony may permit the inference that she was physically capable of providing assistance to the baby after birth, Vaughan contends that factors such as her age, first childbirth, lack of knowledge concerning postpartum care, and distress resulting from the shock of birth negate any intent to cause the baby's death.

"[T]he traditional and prevailing view . . . is that in a prosecution for killing a newly born baby, it is incumbent upon the State to prove that the child was born alive and had an independent and separate existence apart from its mother, and that the accused was the criminal agent causing the infant's death." *Lane v. Commonwealth*, 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978). *Lane*, a case that neither of the parties addressed, is remarkably similar to this case in many respects. Although *Lane* does not specifically discuss the question of a mother's duty to care for a baby during the travail of childbirth, the question of the sufficiency of the evidence to sustain a conviction of involuntary manslaughter was addressed. In *Lane*, a seventeen year old girl was tried on a murder indictment based upon circumstances arising during childbirth and convicted of involuntary manslaughter. 219 Va. at 510, 248 S.E.2d at 781. The evidence established that the following events gave rise to the murder prosecution:

[T]he defendant, who was 17 years of age . . . was at home alone on May 8, 1976 when she began to suffer stomach pains. She associated the pains with constipation for which she had recently been treated. She decided to take a hot bath and, while soaking in the tub, felt the urge to use the toilet. While seated on the toilet seat, a "white bubble" emerged from her vagina and burst. Defendant then looked down and saw a baby's head protruding from her body. She moved to the edge of the toilet seat, and as the delivery process continued she removed the baby and cradled it as it came out. She noticed that the baby did not cry, was not breathing, did not move or open its eyes, and that it began turning bluish-purple. In an attempt to induce breathing, she turned the child up and spanked it on its bottom as she had seen this done on television, but the child did not respond. She then wrapped the infant in a towel, along with the placenta, which was still

attached to the infant by the umbilical cord and laid it on her bed. Defendant then returned to the bathroom to clean herself and the bathroom. After accomplishing this, she placed the blood-soaked towels and a bath mat in a garbage pail. She then put the garbage pail with its contents and the baby into a large plastic garbage bag and tied it at the top. As defendant was taking the garbage bag out of the house, her brother and mother arrived. When the brother asked defendant what was in the bag, she gave an evasive answer. Defendant placed the bag in her car and drove to Old Wolfsnare Road in Virginia Beach where she placed the bag under some trees off the side of the road.

The next day, defendant was married and she and her husband left on a short wedding trip. Presumably, the defendant did not tell anyone about the occurrences of the afternoon before.

219 Va. at 510-11, 248 S.E.2d at 781-82.

The evidence in *Lane* also established that the defendant was examined by her physician in February, March, and April of 1976. During the March visit when the physician asked if she could be pregnant, she answered, "no." "[A]t no time during these visits did [the physician] determine that the defendant was pregnant, nor did he ever tell her that she was not pregnant." 219 Va. at 514, 248 S.E.2d at 783. When confronted, after she was discovered to be the mother of the dead baby, the defendant stated "that the birth came as a shock because she did not know that she was pregnant until [the baby appeared]." 219 Va. at 511-12, 248 S.E.2d at 782.

The medical evidence in *Lane* established that the baby was born alive. Some of the physicians who testified did not express an opinion concerning how long the baby had lived. 219 Va. at 512, 248 S.E.2d at 782. One physician said the baby "did not survive for more than a few minutes at the most." 219 Va. at 513, 248 S.E.2d at 783. The baby died from a lack of oxygen. The Supreme Court reversed the involuntary manslaughter conviction, finding no evidence "that the [baby] ever achieved an independent and separate existence apart from its mother," 219 Va. at 512, 248 S.E.2d at 782, and no evidence upon which to infer that the

death was caused by placing the baby in the bag. 219 Va. at 515, 248 S.E.2d at 784.

There are several reported Virginia cases discussing the sufficiency of proof of criminal agency where death is caused by a person who fails to provide basic care for someone to whom he or she owes a duty of care. In *Davis v. Commonwealth*, 230 Va. 201, 335 S.E.2d 375 (1985), the defendant lived in her mother's home with her mother, who had been totally disabled and senile for a number of years. The defendant was the authorized representative to receive food stamps for her mother's benefit and was the representative payee of her mother's monthly social security check. The defendant's mother was discovered lying on a bed in an unheated room on a cold November day and died shortly thereafter in the hospital. The medical examiner "concluded that the causes of death were 'pneumonia and freezing to death due to exposure to cold with a chronic state of starvation.' . . . [A]ny one of these conditions alone could have caused her death." 230 Va. at 203, 335 S.E.2d at 376. The examiner testified that at the time of her death, the mother had not had any liquids for at least two days and 'no food whatsoever' for at least thirty days." *Id.* at 203, 335 S.E.2d at 377. Our Supreme Court held that because the defendant owed a legal duty, arising from an implied contract, to care for her mother and because her breach "was so gross and wanton as to show a callous and reckless disregard of [her mother's] life," 230 Va. at 205-06, 335 S.E.2d at 378-79, the evidence was sufficient to support a conviction of involuntary manslaughter.

In *Biddle v. Commonwealth*, 206 Va. 14, 141 S.E.2d 710 (1965), the defendant was convicted of first degree murder of her three month old child. The medical evidence revealed that the child died from malnutrition and dehydration and that at the time of her death the child had not been fed for several days. 206 Va. at 19, 141 S.E.2d at 714. Although the mother testified that she fed the baby everyday and that on the day of her death she fed her three times, the mother also admitted that during a period of approximately one month before the baby's death, several days lapsed between feedings. She stated that the reason she did not feed the baby was because her husband accused her of having the baby and her five other children by someone else. She "figured" he would not care if the baby died. She further stated that the only time she fed the child was on days when she and her husband

got along well together. Our Supreme Court reversed the conviction of first degree murder, concluding that the Commonwealth proved that the defendant had been careless and indifferent toward the child but had not proved beyond a reasonable doubt that the defendant willfully or maliciously withheld food or liquids from the child.

These cases support the principle that where a person maliciously omits to perform a duty of care that is owed and that omission results in death, the offense is murder. *Davis v. Commonwealth*, 230 Va. at 205, 335 S.E.2d at 378; *Biddle*, 206 Va. at 20, 141 S.E.2d at 714. If, however, no malice is shown but the person is criminally negligent in performing such a duty, the offense is manslaughter. *Davis*, 230 Va. at 205, 335 S.E.2d at 378; *Biddle*, 206 Va. at 20, 141 S.E.2d at 714. "Malice, a requisite element for murder of any kind, is unnecessary in manslaughter cases and is the touchstone by which murder and manslaughter cases are distinguished." *Essex v. Commonwealth*, 228 Va. 273, 280, 322 S.E.2d 216, 219-20 (1984).

> The authorities are replete with definitions of malice, but a common theme running through them is a requirement that a wrongful act be done "willfully or purposefully." *Williamson v. Commonwealth*, 180 Va. 277, 280, 23 S.E.2d 240, 241 (1942). This requirement of volitional action is inconsistent with inadvertence. Thus, if a killing results from negligence, however gross or culpable, and the killing is contrary to the defendant's intention, malice cannot be implied. In order to elevate the crime to second-degree murder, the defendant must be shown to have willfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm.

*Id.* at 280-81, 322 S.E.2d at 220.

When the Commonwealth has proved the commission of a homicide and has pointed out the accused as the criminal agent, the facts of the case may be such as to permit the trier of fact to draw an inference of malice. *Hodge v. Commonwealth*, 217 Va. 338, 343, 228 S.E.2d 692, 696 (1976). Often it is stated that malice is presumed; however, this "presumption amounts to no more than an inference which the trier of fact is permitted, but is not required, to draw from proven facts." *Id.* The ultimate burden of

persuasion upon the critical issue of malice and every other material element of a charge rests with the prosecution. *Id.* at 342, 228 S.E.2d at 695. "[T]he presumption of innocence to which an accused is entitled follows him throughout the trial. This presumption is sufficient to require his acquittal on the charge brought against him unless the Commonwealth proves beyond a reasonable doubt every material element of that charge." *Id.*

It is well settled in Virginia that to justify conviction of a crime, it is not sufficient to create a suspicion or probability of guilt, but the evidence must establish the guilt of an accused beyond a reasonable doubt. It must exclude every reasonable hypothesis except that of guilt. The guilt of a party is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence.

*Cameron v. Commonwealth*, 211 Va. 108, 110-11, 175 S.E.2d 275, 276 (1970). "[W]here the evidence leaves it indefinite which of several hypotheses is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof [beyond a reasonable doubt], however great the probability may be." *Massie v. Commonwealth*, 140 Va. 557, 565, 125 S.E. 146, 148 (1924).

The Commonwealth contends that the evidence in this case, when viewed in the light most favorable to the Commonwealth, was sufficient for a juror reasonably to infer beyond reasonable doubt that the baby's death was caused by a malicious, willful, deliberate, and premeditated omission. The Commonwealth contends that evidence that Vaughan had babysitting experience and that she went to a physician sometime after the birth to stop her milk flow was sufficient for the jury reasonably to infer that Vaughan was aware of a baby's needs immediately after birth. As support for the inference that Vaughan harbored an intent to kill the baby, the Commonwealth points to evidence that Vaughan never took active steps to put the baby up for adoption, that she kept her pregnancy a secret, that she failed to call for aid from her father or neighbors during labor and after the birth, and that she disposed of the baby's body in secret. The Commonwealth also contends that the psychologist's testimony that Vaughan was not suffering from mental incapacitation or retardation and did not suffer any dissociative reaction, further supports a reasonable in-

ference that Vaughan intended to kill the baby in a willful, deliberated, and premeditated manner.

We conclude that the evidence was inadequate to prove beyond a reasonable doubt that Vaughan acted with malice, willfulness, deliberation, or premeditation. That Vaughan never took active steps toward placing the baby for adoption before the birth is not a fact which would support a reasonable inference that she intended to kill the baby. Making adoption arrangements prior to a birth may be advisable, but it is not reasonable to infer that the failure to do so indicates a plan to kill a baby. A failure to arrange for adoption prior to the birth is equally consistent with procrastination, ignorance of procedures necessary for adoption, or a subconscious desire to keep the baby after the birth. Moreover, the evidence that Vaughan kept her pregnancy, the labor, and the birth of the baby a secret does not support, beyond a reasonable doubt, an inference of intent to kill the baby. Although this evidence may be consistent with the behavior of a person who intends to kill a baby at birth, it is also consistent with the behavior of an unwed young girl who is frightened, enveloped in shame, and embarrassed about her pregnancy and labor. Disposing of the baby's body is behavior that is as consistent with shame, an attempt to avoid embarrassment, and fear of incurring the anger of one's parents as it is consistent with an attempt to conceal a murder.

Furthermore, the record contains no evidence that Vaughan knew that a failure to cover the baby, clear his air passages, and tie the umbilical cord could cause the baby's death. No evidence in the record proves that Vaughan, a sixteen year old girl who had never before been pregnant, ever acquired from her grade school sex education courses or from other sources any instruction on postpartum care. A juror could not reasonably infer that Vaughan's babysitting experience would impart such knowledge. Likewise, the evidence that Vaughan visited a physician to stop her milk flow sometime after the birth does not support a reasonable inference that Vaughan knew how to perform postpartum care. Although Vaughan's inattention to the baby may have been tragically indifferent and recklessly negligent, the evidence in this case was inadequate to prove beyond a reasonable doubt the willful, deliberate, premeditated omission necessary to sustain a first degree murder conviction.

The Commonwealth's evidence that Vaughan suffered no mental illness, mental retardation or dissociative reaction is insufficient to establish that Vaughan knew or should have known that her failure to supply postpartum care would result in the baby's death. Such knowledge must necessarily exist and proof of such knowledge is prerequisite to finding that Vaughan harbored the intent to kill the baby in this manner. Even if the Commonwealth had proved that Vaughan knew of the consequences of her failure to provide postpartum care, evidence that she was mentally competent and suffered no dissociative reaction does not, without further support, lead to a reasonable inference that she acted with malice and a deliberate intention to bring about the baby's death. The Commonwealth's own evidence established that Vaughan was sixteen years of age, was "psychosocially immature," was "shocked and upset," and was experiencing "a considerable amount of trauma . . . involved with the discharge of a baby." Moreover, pathological evidence indicated "that something may have been wrong during the delivery process" which may have contributed to the baby's death. *See State v. Doyle*, 205 Neb. 234, 287 N.W.2d 59 (1980) (where a young girl gave birth to a baby unattended, dropped the baby while attempting to place him on the bed, and wrapped the baby in a blanket, believing the baby was dead, the court reversed a conviction of involuntary manslaughter, holding that although medical evidence showed that the baby died of smothering or neonatal respiratory failure, there was insufficient evidence that the defendant "acted in such a manner as to import a thoughtless disregard of the consequences of her act or heedless indifference to the rights and safety of the baby"); *Osmus*, 73 Wyo. 183, 276 P.2d 469 (1954)(nonfeasance during unattended birth, by a twenty-one year old defendant who had some training as a nurse, insufficient to prove manslaughter); *Williams v. State*, 88 Ga. App. 761, 77 S.E.2d 770 (1953)(where a mother left her baby near a heater for a short period of time following an unattended birth and thereafter attempted to conceal the body because she did not want her family to know about the birth, the court reversed a conviction of involuntary manslaughter); *Singleton v. State*, 33 Ala. App. 536, 35 So. 2d 375 (1948)(while mother may have been guilty of nonfeasance in failing to tie the umbilical cord of a baby that died shortly after an unattended birth, there was insufficient evidence of criminality to sustain a homicide conviction).

The evidence presented in this case is not "inconsistent with innocence," *Cameron*, 211 Va. at 110-11, 175 S.E.2d at 276, and fails to "exclude every reasonable hypothesis except guilt." *Id.* at 110, 175 S.E.2d at 276. The evidence is therefore insufficient to prove beyond a reasonable doubt that Vaughan acted with malice, willfulness, deliberation, or premeditation. Accordingly, we reverse Vaughan's conviction of first degree murder. The Commonwealth, if it be so advised, may retry the defendant for the offense of involuntary manslaughter or other lesser included offenses.

*Reversed and remanded.*

Koontz, C.J., and Cole, J., concurred.