LEWIS *vs.* THE STATE OF GEORGIA

1. Death ensuing in consequence of the wilful omission of a duty is murder; death ensuing in consequence of the negligent omission of a duty is manslaughter. Therefore, where the death of a child resulted from cruelty and want of proper food and clothing, the person whose duty it was to maintain and care for it, and whose conduct resulted in its death, was guilty of murder, if the acts were wilfully done; and of manslaughter, if they were negligently done, without malice.

(a.) If the death results from the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, although the killing itself be not intended, the offense is murder.

(b.) The charge was full and fair, and the question of *animus* was sufficiently submitted to the jury.

2. The sayings of the defendant, made by her during the continuance of the cruel treatment, were not admissible on her own behalf, when offered by her to account for scars and other marks of violence and severe usage appearing upon the person of the deceased.

3. The verdict was not only sustained, but required by the evidence, and a recommendation to life imprisonment was all that the defendant could ask.

December 21, 1884.

Criminal Law. Murder. Manslaughter. Charge of Court. Before Judge LAWSON. Baldwin Superior Court. January Term, 1883.

Louisa Lewis was indicted for murder, and was convicted, and sentenced to the penitentiary for life. The facts were, briefly, as follows :

A child of eight or ten years of age died under such circumstances as to cause an inquest to be held. A physician examined his body, and found evidences of great ill-treatment and severe usage. There were scars on the head and on different portions of the body, apparently the results of blows; some were older and some of recent date; some of the latter were two inches in length by half an inch broad ; there was a contusion on the side, as if from a severe blow ; there were fresh marks on the legs, as of a switch or other instrument ; the right wrist had been burned, and the wound partially healed, but re-opened, apparently by a recent blow, and left raw, and the body was fearfully emaciated. In the opinion of the physician, the child came to his death from want of proper food, exposure to inclement weather, and the treatment which it had received.

From other testimony for the state, the following history of this child's life is taken :

The child was an orphan, named Willie McDowell. Its mother died in Memphis, and left her child to defendant ; it was then about five years of age. One witness testified that even then complaint was made to him, as town marshal, by the neighbors, about the cruel beating of the boy. The witness saw him, and he had been cut over the head, and his lip was swollen, as if from a blow. Defendant sent him to Augusta, and he remained there for some time, being brought back several months before his death. After his return, the treatment of him was very severe. Defendant tied him with ropes, blindfolded him, and stripped him naked in the bitter cold weather of winter, used sticks and a knotted plow-line to whip him, and sent him to the

cotton-field so insufficiently clothed that one of the neighbors protested against it. After one of these beatings, blood was seen running down the legs of the boy, and his clothes were clotted with it. She broke a broom-handle over his head. And because she said he had befouled the floor, she forced him to eat his own excrement. On one or two occasions he asked neighbors for food, and once was seen to obtain a crust to eat by concealing it with his feet. On different occasions she stated that she wished the child was dead, that she would whip or kill him, and that he ought to be in his grave. On the morning of the death, the child was sent to the spring for water. He was slow in returning, and defendant went for him. She beat him severely over his hands—only partially healed from the burning which they had received—with a barrel hoop, until the blood was running from them; she then threw water over them, and, putting a bucket on his head, told him to carry it. He was too weak to do so, and defendant took the bucket herself, caught him by the wrist, and pulled him after her up the hill; when she turned him loose, he fell several times on the road to the house. After arriving there, he lay down and began to cry, and began to catch at things near him, as if in a fit. Defendant administered balsam and whisky; he bit a piece from the glass; she threatened to have him carried to the poor-house, if he did not hush. He was frightened, and ran under the bed; she dragged him out, and put him on his pallet. Those present went into the next room and left him there. After a while, the noise ceased; the child was quiet. He was dead.

The evidence for the defendant went to show that the child was diseased, had hereditary syphilis, causing the sores which were on his head and body, which would run and heal; that her treatment of him was not cruel, and that she provided sufficiently for him.

The jury convicted defendant, with a recommendation that she be imprisoned for life. She moved for a new trial, on the following grounds:

(1.) Because the verdict was contrary to law and evidence.

(2.) Because the court rejected the evidence of a witness offered to show that some time prior to the death of the deceased, when defendant exhibited to the witness the scars on the child's head, she made certain statements concerning them and their cause.

(3.) Because the court charged, without quailification as to *animus*, that if the conduct of the defendant did contribute to the death of the child, it was criminal, and she would be guilty of one or another of the crimes as mentioned,—murder, or voluntary or involuntary manslaugter; and if his death resulted either proximately or remotely from her conduct in the case, then she is guilty of some crime. [The court charged fully as to the presumption of innocence, reasonable doubts, etc., and after stating the position of the state and the defence, charged as follows : "Judge of the testimony. Did the conduct of the defendant contribute, either proximately or remotely, to the death of this individual? Did his death ensue from disease of any kind, either congenital syphilis or other disease? Dit it ensue from natural causes? If so, she is not guilty. But if it ensued from her own conduct, by a long continuation of conduct on her part, in which she maltreated the deceased, in which she beat him or starved him, as charged in the indictment, or exposed him to severe and inclement weather without sufficient clothing and food, as charged in the indictment, and if his death was brought about by a long series of acts of that character, and by nothing else, then you would be authorized to say she is guilty. The indictment charges that starvation is one of the elements that entered into the causes of his death. For one to be guilty of starving another, that one must have the means to supply the person with food, and intentionally and wilfully withhold it, in order to make out a case of starvation. If a person be poor and destitute, lacking in means, lacking in provisions, and by that

means a person under her control suffer from want of food, it is not starvation; it is not criminal starvation, at all events; it is not such as the law pronounces as criminal. If you find that the conduct of the defendant did contribute to the death of the child, then it would be your duty to inquire what grade of crime the defendant committed. Was it murder, voluntary manslaughter or involuntary manslaughter? If the conduct of the defendant did contribute to the death of the child, it was criminal, and she would be guilty of one or the other of these crimes as mentioned,—murder, voluntary manslaughter or involuntary manslaughter."

He then charged fully as to the different degrees of homicide.]

The motion was overruled, and defendant excepted.

C. P. CRAWFORD, by brief, for plaintiff in error.

C. ANDERSON, attorney general; ROBERT WHITFIELD, solicitor general, by J. H. LUMPKIN, for the state.

HALL, Justice.

1. "Death ensuing in consequence of the wilful omission of a duty will be murder; death ensuing in consequence of the negligent omission of a duty will be manslaughter." In Rex vs. Hughes, Lord Campbell, delivering the opinion of the court of criminal appeal, said: "It has never been doubted that, if death is the direct consequence of the malicious omission to perform a duty, as of a mother to nourish her infant child, this is a case of murder. If the omission was not malicious, and arose from negligence only, it is a case of manslaughter." Roscoe's Cr. Ev., 723, and cases cited. Where a sick or weak person is exposed to cold, with an intent to destroy him, this may amount " to wilful murder, under the rule that he who wilfully and deliberately does any act which apparently endangers another's life, and thereby occasions his death, shall, unless he clearly prove to the contrary, be adjudged to kill him of

malice *prepense.*" *Ib.*, and citations. Cases have arisen under this principle, where apprentices and prisoners have died in consequence of the want of sufficient food and necessaries, and where the question has been, whether the law would imply such malice in the master or jailer as is necessary to make the offence murder. A husband and wife were both indicted for the murder of a parish apprentice bound to the former. Both the prisoners had used the deceased in a most cruel and barbarous manner, and had not provided him with sufficient food and nourishment; but the surgeon who opened the body deposed that, in his opinion, the boy died from debility and want of proper food and nourishment, and not from the wounds he had received. Lawrence, J., upon this evidence, was of opinion that the case was defective as to the wife, as it was not her duty to provide the apprentice with food, she being the servant of the husband, and so directed the jury, who acquitted her, but the husband was found guilty and executed. *Ib.*, 724 and citations.

"Huggins, the warden of the Fleet, appointed Gibbons his deputy, and Gibbons had a servant, Barnes, whose duty it was to take care of the prisoners, and particularly of one Arne. Barnes put him into a newly-built room, over a common sewer, the walls of which were damp and unwholesome, and kept him there forty-four days without fire, chamber-pot, or other convenience. Barnes knew the state of the room, and for fifteen days, at least, before the death of Arne, Huggins knew its condition, having been once present, seen Arne, and turned away. By reason of the duress of imprisonment, Arne sickened and died. During the time Gibbons was deputy, Huggins sometimes acted as warden. These facts appearing on a special verdict, the court were clearly of opinion that Barnes was guilty of murder. They were deliberate acts of cruelty and enormous violations of duty reposed by the law in the ministers of justice, but they thought Huggins not guilty," because he had only seen the deceased once during his

confinement, and that, from this alone, it could not be inferred that he knew that his situation was occasioned by improper treatment or that he consented to its continuance. He knew nothing of the circumstances under which deceased was placed in the room against his consent, or the length of his confinement, or how long he had been without the decent necessaries of life. "It was also material that no application had been made to him, which, perhaps, might have altered the case." *Ib.*, 725.

Where the death ensues from incautious neglect, however culpable, rather than from any actual malice or artful disposition to injure, or obstinate perseverance in doing an act necessarily attended with danger, regardless of its consequences, " the severity of the law," says Mr. East, " may admit of some relaxation, but the case must be strictly freed from the latter incidents." 1 East's P. C., 226 ; Roscoe's Cr. Ev., 726. These citations have been made almost at random from a vast number of similar cases scattered through the elementary treatises on criminal law and the reports of the decisions upon the subject. The distinction so clearly pointed out by them is made by our own Code, §4327, which provides that where an involuntary killing shall happen in the commission of an unlawful act, which in its consequences naturally tends to destroy the life of a human being, the offence shall be deemed and adjudged to be murder.

In the case at bar, this law was admirably illustrated in the able, clear and carefully prepared charge which judge Lawson gave the jury. Every phase of the case was presented; nothing was omitted that should have been presented, and nothing was presented that ought to have been left out; at least, nothing of which the prisoner could complain.

The only exception which the ingenuity and learning of able and zealous counsel could find to it was, that there was error in not " qualifying it as to the *animus*; that, if the conduct of defendant did contribute to the death of

the child, it was criminal, and she would be guilty of one or the other of the crimes mentioned,—murder, voluntary or involuntary manslaughter," and "if his death resulted, either proximately or remotely, from her conduct in the case, then she is guilty of some crime." When taken in connection with the context, it will be readily seen that this exception is not well founded. The charge is full and explicit as to the *animus* required to constitute crime in the accused.

2. There was no error in rejecting the sayings of the defendant made during the continuance of the cruel treatment of the deceased, when offered by her to account for the scars and other marks of violence and hard usages which appeared upon his person. She could not be permitted thus to fabricate testimony in her own favor. *Mitchell vs. The State*, 71 *Ga.*, 128.

3. This verdict was not only sustained, but, in our opinion, required by the evidence. We cannot enter into its heart-sickening and revolting details, nor do we trust ourselves to characterize it by any general description, lest we might appear to be indulging in invective and denunciation, rather than temperate and measured reflections, indispensable to judicial fairness or calm deliberation. The jury, in recommending that she be imprisoned in the penitentiary for life, " seasoned justice with mercy," which, if not perverted and misapplied, was at least " strained to its utmost tension." If they erred at all, they erred on the side of safety ; perhaps in deference to her sex, and because they thought it was better that ninety-nine guilty persons should escape than that one innocent person should suffer. They were more lenient to her than she seems to have been to this dependent and helpless child.

Judgment affirmed.