## Richmond

### Shirley Mae Biddle v. Commonwealth of Virginia.

April 26, 1965.

Record No. 5933.

Present, All the Justices.

*John A. Gurkin, Jr.*, for the plaintiff in error.

*D. Gardiner Tyler, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

I'Anson, J., delivered the opinion of the court.

Defendant, Shirley Mae Biddle, having waived a jury trial, was tried by the court on an indictment charging her with the murder of her three-month-old baby girl and found guilty of murder in the first degree. After receiving a report from the probation officer, the trial court fixed her punishment and sentenced her to the State penitentiary for a period of twenty years. We granted her a writ of error.

Defendant contends that the trial court erred (1) in admitting into evidence her second statement to the police; and (2) in holding that the evidence was sufficient to sustain a conviction of first degree murder.

The defendant lived with her husband and six children in an apartment on Pulaski street in the city of Norfolk. She was 25 years old, had an 11th grade education, and had not heretofore been in any trouble.

On January 22, 1964, detectives Henley and Sutton, of the Norfolk police department, were called to defendant's apartment to view the body of defendant's baby, and after observing the deceased they requested the medical examiner to perform an autopsy.

Upon receipt of the medical examiner's report, the detectives returned to the defendant's home on January 24, 1964, at 9:30 P.M., and took her and her husband to police headquarters. Upon their arrival there, at approximately 9:45 P.M., detective Henley told the defendant that the post-mortem report showed that the baby had died from malnutrition and dehydration, and that he would like for her to answer some questions relating to the child's health and how often she was fed. In answering Henley's questions, she said, among other things, that she fed the baby food and liquids on a regular schedule each day; that on the day of its death she and the baby had returned to her apartment at approximately 9:00 P.M., after spending the day with her mother who lived in the same building, and when she put her down she noticed that her hands were cold and realized that she was dead.

After reducing defendant's statements to writing, Henley left the room and talked with her husband in another room. When he returned to the room where the defendant had been left alone he found her crying. He asked her if she wanted to tell the truth about how she fed the baby and she said, "Yes, I do." The defendant then pointed out on a calendar the dates on which she had fed the baby.

The dates given indicated that during the period of approximately a month prior to the baby's death, several days elapsed between feedings. She said that the reason for the intermittent feedings was that her husband had accused her of having the baby by her stepfather; that he was always telling her that none of her six children were his, and she "figured" he wouldn't care if the baby died. She stated that she was able to point out the dates of feedings because they were the only times she and her husband got along well together. These statements were reduced to writing and signed by the defendant at 1:30 on the morning of January 25th. Defendant was then placed under arrest and charged with the murder of the baby.

Defendant says that the court erred in admitting her second statement into evidence because she had not been warned that she could remain silent.

Before the statement complained of was admitted into evidence, the court heard the testimony of Henley and the defendant relating to the circumstances under which it was made. Henley testified that the defendant made the statement freely and voluntarily and without any threats or promises of any kind being made.

On the other hand, defendant stated that while she was not threatened or abused, she made the second statement because she was afraid; that Henley told her she had lied in the first statement, since the child had died from a lack of nourishment; and that he said, "If you will just let us write you up, you can go home."

The evidence does not show that Henley warned the defendant that she could remain silent and that any statement she made could and might be used against her. Although we have said that it is the better practice to warn one under investigation that he does not have to say anything, the rule in this Commonwealth, which is amply supported by authorities, is that the failure of an officer to warn a person that he may remain silent does not render a voluntary confession inadmissible. The test of its admissibility is the voluntariness of the statement. *Mendoza* v. *Commonwealth*, 199 Va. 961, 965, 103 S. E. 2d 1, 4, cert. den. 358 U. S. 873, 79 S. Ct. 111, 3 L. ed. 2d 103. However, in the light of the majority holding in *Escobedo* v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. ed. 2d 977 (June 22, 1964), and the cases relied on therein, we must reexamine our holding and determine if what was said in *Escobedo* is controlling under the facts and circumstances in the present case.

In *Escobedo*, Mr. Justice Goldberg, speaking for a majority of the Court, said:

"The critical question in this case is whether, *under the circumstances,* the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment' [citing authority] * * * and thereby renders inadmissible in a state criminal trial any incriminating statement elicited by the police during the interrogation." (Emphasis added.)

In answering the question presented, it was said: -

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the states by the Fourteenth Amendment' [citing authority] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

In interpreting the holding in the *Escobedo* case, the highest courts of several states have reached conflicting conclusions as to its effect.

In *People* v. *Hartgraves,* 31 Ill. 2d 375, 202 N. E. 2d 33 (Sept. 29, 1964), the Supreme Court of Illinois refused to suppress two confessions made by the accused on the ground that the holding in *Escobedo* applied when there was a refusal of a request to consult with counsel, coupled with the failure to warn the accused of his right to remain silent.

In *State* v. *Neely,* 395 P. 2d 557 (Ore., Sept. 30, 1964), the Supreme Court of Oregon held that the decision in *Escobedo* required the rejection of a confession when the State did not effectively show that the accused had been affirmatively warned of his right to remain silent prior to making a confession.

The California Supreme Court, in *People* v. *Dorado,* 42 Cal. Rptr. 169, 398 P. 2d 361 (January, 1965), by a divided court, held a confession inadmissible and interpreted the holding in *Escobedo* to mean that when the focus is upon the accused he must be afforded right of counsel as soon as the process shifts from investigatory to accusatory.

In *Haynes* v. *State of Washington,* 373 U. S. 503, 83 S. Ct. 1336, 10 L. ed. 2d 513 (1963), the United States Supreme Court said that

the failure to warn a defendant and advise him of his right to remain silent is merely an attendant circumstance "which the accused is entitled to have appropriately considered in determining the voluntariness and admissibility of his confession." 373 U. S. at p. 517, 83 S. Ct. at p. 1345.

We do not interpret the holding in the *Escobedo* case to mean that a voluntary confession made to the police in a routine investigation to ascertain whether a crime has been committed and to question persons who may have some knowledge of the facts is absolutely inadmissible unless the party making a confession has first been affirmatively warned that he may remain silent. Hence, the circumstances under which a confession is made are determinative of its admissibility.

The circumstances under which the confession was obtained in *Escobedo* are not present in the instant case. Here, the defendant and her husband were taken to police headquarters for the purpose of having them shed some light on the baby's health and feeding schedule, since her death had resulted from malnutrition. The questioning of the defendant was purely in the investigatory stage. Failure of detective Henley to warn defendant that she could remain silent was merely a circumstance to be considered in determining the voluntariness and admissibility of her confession. An able and experienced trial judge saw and heard the witnesses, and found that the statement complained of was made freely and voluntarily by the defendant, without any threats, abuse or promise of reward. His finding is amply supported by the evidence.

We hold that the confession was made voluntarily by the defendant, and that the circumstances under which it was obtained did not render it inadmissible.

Nothing we have here said is in conflict with our holding in the recent case of *Cooper* v. *Commonwealth*, 205 Va. 883, 140 S. E. 2d 688 (March 8, 1965). There the defendant, without the assistance of his retained counsel, was interrogated by a police officer three days after the rape charge against him had been dismissed at a preliminary hearing and again subsequent to his indictment on the charge by a grand jury. We held that the defendant had been deprived of his constitutional right to assistance of counsel, and that under the circumstances his alleged admissions to the officer were inadmissible.

The defendant says that the evidence is sufficient to sustain a conviction of manslaughter but it fails to support her conviction

of murder in the first degree, because the death of the baby resulted from negligence and not from a malicious omission of duty.

When the detectives visited defendant's home on the night of January 22, 1964, Henley observed the deceased baby's body in an extreme condition of malnutrition, and when he unpinned her diaper he found blood spots on it and on her private parts from diaper rash. He observed another infant lying on newspapers in a bassinet, with a leather jacket over her, and her diapers were wet and dirty and there was a rash on her buttocks. In the kitchen the detectives saw a large, open can of Pet milk, with a saucer covering the top, and food on the stove which appeared to have been there for several days.

Medical testimony shows that when the baby was born on October 18, 1963, she "seemed to be perfectly healthy." There was also evidence that the baby weighed 5 pounds 8 ounces at birth.

Testimony of the medical examiner reveals that he made a post-mortem examination of the baby's body two days after her death; that she weighed 4 pounds 5½ ounces; that the intestinal tract and stomach were entirely empty, and that the body was dehydrated. It was his opinion that the child had not been fed for several days.

The defendant repudiated the second statement made to Henley relative to the times of feeding the baby. She testified that she fed the baby every day but she was small and sometimes would not drink all the milk she gave her; that she fed her three times on the day she died; that she ate very little pablum and fruit; that she never cried because she was hungry; that she loved the baby and did not treat her any differently from the rest of her children; that she had the means to buy food for the children and had milk and other baby food on hand at all times; that she knew the baby had lost weight but had not taken her to a doctor; that her husband had accused her of having the baby by her stepfather and her other children by other men, and she stayed upset most of the time over his untrue accusations.

Defendant's mother said that the baby had been in her home during the day she died and that she had fed her a small amount of fruit and pablum twice on that day, but that she did not appear to be very well.

Section 18.1-21, Code of 1950, as amended, 1960 Repl. Vol., 1964 Cum. Supp., distinguishes the degrees of murder, but it does not define murder itself. The statute reads as follows:

"Murder by poison, lying in wait, imprisonment, starving, or by

any wilful, deliberate and premeditated killing, or in the commission of, or attempt to commit, abduction as defined in § 18.1-38, arson, rape, robbery or burglary, is murder of the first degree. All other murder is murder of the second degree."

Murder at common law is a homicide committed with malice aforethought, either express or implied. 9 Mich. Jur., Homicide, § 9, p. 351.

The precise question presented here seems never to have been decided by this Court. The general rule, supported by numerous authorities in England and the United States, is that if death is the direct consequence of the malicious omission of the performance of a duty, such as of a mother to feed her child, this is a case of murder; but if the omission is not wilful, and arose out of neglect only, it is manslaughter. *Regina* v. *Hughes*, 7 Cox C. C. 301, 302; *Commonwealth* v. *Hall*, 322 Mass. 523, 78 N. E. 2d 644, 647; *Lewis* v. *State*, 72 Ga. 164, 53 Am. Rep. 835; *Williams* v. *State*, 88 Ga. App. 761, 77 S. E. 2d 770; *Pallis* v. *State*, 123 Ala. 12, 26 So. 339, 82 Am. St. Rep. 106; *State* v. *Bischert*, 131 Mont. 152, 308 P. 2d 969, 972; *State* v. *Shephard*, 255 Iowa 1218, 124 N. W. 2d 712, 721 (Iowa, Nov. 12, 1963, reh. den. Jan. 14, 1964); *Gibson* v. *Commonwealth*, 106 Ky. 360, 50 S. W. 532, 90 Am. St. Rep. 230. See Annotation in 61 L. R. A. 290; also 1 Wharton's Criminal Law, 12th ed., § 485, p. 715; 1 Wharton's Criminal Law & Practice (Anderson) § 297, p. 623; 26 Am. Jur., Homicide, § 207, pp. 295, 296; 40 C. J. S., Homicide, § 20, p. 867.

In *Commonwealth* v. *Hall, supra,* the defendant was convicted of murder in the second degree. A jury found that a two-month-old baby died of starvation and dehydration resulting from the intentional conduct of the defendant in placing it in an attic and withholding food and liquids from it.

In *Lewis* v. *State, supra,* a five-year-old child came to his death from the want of proper food, exposure to inclement weather, and physical abuse that he had received, and the defendant was found guilty of murder and sentenced to life imprisonment.

In *State* v. *Bischert, supra,* the defendant was charged with the manslaughter of his 5½-month-old baby by neglecting and refusing to provide the necessary food to sustain the child's life. Although the conviction was reversed because of the introduction of prejudicial photographs, the court held that a failure to provide the necessities of life to one whom is owed a duty is a sufficient basis on

which to predicate and sustain a conviction for a negligent homicide, that is involuntary manslaughter.

In *Pallis v. State, supra,* the defendant was convicted of an assault with intent to murder, and the court quoted Mr. Bishop on Criminal Law as follows:

"If the exposure or neglect of an infant or other dependent person, resulting in death, is an act of mere carelessness wherein the danger to life does not clearly appear, the homicide is only manslaughter; whereas if the exposure or neglect is of a dangerous kind, it is murder. For example, if from an infant of tender years the person under obligation to provide for it wilfully withholds needful food or any other needful thing, though not with intent to kill, and by reason thereof the child dies, he commits murder." 2 Bish. New Cr. Law,, § 686.

Thus, from the authorities heretofore quoted, whether the defendant was guilty of manslaughter or murder depends upon the nature and character of the act or acts which resulted in the child's death.

Here the defendant was harassed by her husband's accusations that none of her children was his, and the baby's feedings appeared to depend upon how she and her husband got along. When the relationship between them was pleasant she fed the baby, but when it was not she neglected her. She had milk in the house to feed the baby the night it died, but it is apparent from the medical examiner's testimony that she had not fed her for several days. The conditions found when the detectives first went to the apartment and the statements contained in the second signed paper writing made by the defendant to Henley at police headquarters show that she neglected the baby and was careless and indifferent in the performance of her duties not only to the baby, but to other members of her family as well. But, from a consideration of all the facts and circumstances of the case, the Commonwealth has not proved beyond a reasonable doubt that defendant wilfully or maliciously withheld food and liquids from the baby. Hence the conviction of first degree murder is not supported by the evidence, and for this reason the judgment is reversed and the case is remanded for a new trial.

Defendant's court-appointed counsel is allowed a fee of $200, plus expenses, for representing her on the appeal in this Court.

*Reversed and remanded.*