596 A.2d 655

Alan William SIMPKINS and Grace Catherine Geisler

v.

STATE of Maryland.

No. 1758, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Oct. 3, 1991.

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellants.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty., for Baltimore City, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and MOTZ and HARRELL, JJ.

WILNER, Chief Judge.

This case arises from the tragic, senseless death of two year-old Brandy Simpkins. She died of starvation—or, as the medical examiner testified, malnutrition and dehydration. As a result, Brandy's parents—Alan Simpkins and Grace Geisler—were charged with first degree, premeditated murder. After trial before the Circuit Court for Baltimore City, sitting without a jury, they were each convicted of second degree murder.

In this appeal, both appellants contest the evidentiary basis for the murder convictions. In addition, Geisler attacks the court's refusal to suppress a statement she gave to the police, and Simpkins complains that his sentence was illegally increased. We believe that his sentence *was* il-

legally increased and shall correct that error, but we find no merit in the other complaints.

### The Murder Convictions

Brandy lived with her parents and her four year-old sister, Heather. A houseguest, John Monte, had been living with the family for just under two weeks. Mr. Monte normally slept on a mat in Brandy's room, but for the two nights prior to her death he had slept downstairs. On Monday morning, December 18, 1989, as Ms. Geisler hurriedly left the house to deal with some problem involving Heather, Mr. Monte recalled that he had not seen Brandy since the previous Saturday night, and so he went to her room to check on her. He found her in the crib, quite still. Alarmed, he awoke Mr. Simpkins and called 911 for assistance. When the police arrived, they found Brandy in her crib dead, clad only in a diaper.

Dr. Frank Peretti, from the medical examiner's office, also came to the home that afternoon. From his observations of Brandy, from pictures that were taken of the child, and from an autopsy, Dr. Peretti opined that the cause of death was malnutrition and dehydration. There was no evidence of disease or trauma. According to Dr. Peretti, Brandy had not been given food or drink for three to five days. Her stomach contained no food—only 4 cc ("that's about the size of a fingernail," he said) of thin, mucoid material, which the stomach itself secretes; there "were no contents whatsoever in the small and large bowels except for ten grams of tan brown feces located in the rectum." She was found in a diaper that had 370 grams—about three-quarters of a pound—of layered fecal material in it, leading Dr. Peretti to believe that the diaper had not been changed for four to six days. As a result, Brandy had an extensive diaper rash that covered her entire genital area and that Dr. Peretti found to be "very, very severe." The condition of the body indicated that death had occurred more than 24 hours before its discovery.

The malnutrition was both acute and chronic. Dr. Peretti stated that children are born with about a quarter-inch of

subcutaneous fat, which becomes thicker as they grow. Brandy had less than one-sixteenth inch of fat; there was no fat around the kidneys, where there is usually an accumulation of fat. This condition, he stated, accrued over time.

The circumstances under which Brandy was permitted to starve to death were in some dispute. One thing, however, is abundantly clear: it was not because of appellants' inability to provide food. Their kitchen refrigerator was crammed full of food, and they and Heather apparently ate quite well. Mr. Monte testified that he and Ms. Geisler went grocery shopping on December 11 or 12 and spent over $100 on food. The only thing Ms. Geisler needed but did not buy that day was milk.

Other evidence bearing on Brandy's short and pathetic life was presented. According to Mr. Monte, although appellants paid considerable attention to Heather—took meals with her and played with her—Brandy was left in her crib most of the time. Monte said that she cried a lot, wanting to get out of the crib, but he was forbidden to remove her except on the occasions when *he* fed her. Brandy was not allowed to play with Heather and Heather was not allowed in Brandy's room.

Dr. Branson, a pediatrician who had treated Brandy on earlier occasions, testified that Brandy had missed her two-month and four-month immunizations. In August, 1988, when she was a year old, Brandy was hospitalized for failure to thrive because (1) she had lost more than one pound in the previous six months despite Ms. Geisler's assurance that the child had a healthy appetite and was eating heartily, (2) she was dehydrated, and (3) there was "serious infection in her system." Brandy gained weight well during her 10–day stay; Ms. Geisler was told to bring the child back for a check-up three weeks after her discharge, which she failed to do. Although children normally begin walking between nine and twelve months, at 16 months, Brandy was still not walking. On August 9, 1989,

Dr. Branson saw Brandy for the last time. She then weighed 24 pounds three ounces and, although late for a number of her shots, appeared to be in good health. When she died four months later, she weighed only 21½ pounds.

Appellants defend against the second degree murder conviction on the ground that the State failed to prove they acted, or failed to act, with malice toward Brandy. They assert, quite correctly, that "[m]alice is the indispensable ingredient of murder; by its presence, homicide is murder; in its absence, homicide is manslaughter." *Blackwell v. State*, 34 Md.App. 547, 552, 369 A.2d 153, *cert. denied*, 280 Md. 728 (1977) (quoting *Lindsay v. State*, 8 Md.App. 100, 104, 258 A.2d 760 (1969), *cert. denied*, 257 Md. 734 (1970)). This element, they say, was lacking here.

As the Court noted in *Ross v. State*, 308 Md. 337, 340, 519 A.2d 735 (1987), the term "malice" has been used "as a type of legal shorthand to embrace the elements of (1) the presence of the required malevolent state of mind, and (2) the absence of legally adequate justification, excuse or circumstances of mitigation." *Id.*, at 737 n. 1, 519 A.2d at 341 n. 1. There are four "qualifying malevolent states of mind," from which "malice" may be inferred: "(1) the intent to kill, (2) the intent to do grievous bodily harm, (3) the intent to do an act under circumstances manifesting extreme indifference to the value of human life (depraved heart), or (4) the intent to commit a dangerous felony." *Id.* Although, as noted, the State initially charged that appellants intentionally killed Brandy, near the end of trial the prosecutor informed the court that the State was proceeding "on the charges of second degree murder under the theory of depraved heart," and it was upon that theory that the convictions rested.

In *Robinson v. State*, 307 Md. 738, 745, 517 A.2d 94 (1986), the Court, quoting from R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure* § 1.6–3 (1983) at 21, said of this theory:

"A depraved heart murder is often described as a wanton and wilful killing. The term 'depraved heart' means

something more than conduct amounting to a high or unreasonable risk to human life. The perpetrator must [or reasonably should] realize the risk his behavior has created to the extent that his conduct may be termed wilful. Moreover, the conduct must contain an element of viciousness or contemptuous disregard for the value of human life which conduct characterizes that behavior as wanton."

Continuing, and quoting in part from 2 *Wharton's, supra,* § 143, at 197, the Court added: "The critical feature of 'depraved heart' murder is that the act in question be committed 'under circumstances manifesting extreme indifference to the value of human life.' "

In announcing its verdict, the trial court found that "the indifference and the lack of care that has been demonstrated in the evidence presented ... over the past week shows a level of lack of care that is uncommon to cases of this sort" and declared itself satisfied from the evidence "that the element of viciousness or contemptuous disregard for human life has been established in this case...." The argument, essentially, is that this finding is clearly erroneous, unsupported by substantial evidence.

Most cases prosecuted under a "depraved heart" theory involve affirmative conduct—firing a gun or driving a car or boat into a crowd, for example. *See* W. LaFave & A. Scott, *Handbook on Criminal Law* § 70 (1972) at 543; F. Wharton, *The Law of Homicide* §§ 130–133 (3d ed. 1907). But "depraved heart" murder has also been found in cases of malicious omission, including situations where a parent has maliciously allowed a small child to die of exposure or of malnutrition and dehydration.

The development of a "depraved heart" theory to support murder convictions in child exposure or starvation cases started in England. Many courts, in searching for a theory to sustain murder convictions in these tragic cases, quote a statement made by Lord Campbell in *Regina v. Hughes,* 1857, 7 Cox C.C. 301, 302:

"But it has never been doubted that if death is the directed consequence of the malicious omission of the performance of a duty (as of a mother to nourish her infant child) this is a case of murder. If the omission was not malicious and arose from negligence only, it is a case of manslaughter."

What they invariably neglect to mention, however, is that that statement, to the extent of its reference to the errant mother neglecting to nourish her child, is not only pure *dicta* but *sans* any cited precedential authority. *Hughes* involved the death of a workman caused by the failure of a fellow workman to take certain precautions in lowering bricks down a shaft. It had nothing whatever to do with the failure to nourish a child.

There are, however, a number of English cases that do bear directly on the matter and that serve as the backdrop for the development of the law in this country.

In one of the earliest cases, *Regina v. Walters,* 1841, Car. & M. 164, the defendant was charged with murder for having abandoned her newborn infant to the elements. Justice Coltman, sitting in the Oxford Circuit, instructed the jury, in pertinent part:

"If a party do any act with regard to a human being helpless and unable to provide for itself, which must necessarily lead to its death, the crime amounts to murder.... But if the circumstances are not such, that the party must have been aware that the result would be death, that would reduce the offence to the crime of manslaughter, provided the death was occasioned by an unlawful act, but not such as to imply a malicious mind. There have been cases where it has been held, that persons leaving a child exposed and without any assistance, and under circumstances where no assistance was likely to be rendered, and thereby causing the death of the child, were guilty of murder."

*Id.* at 170.

This instruction would appear to permit a murder conviction to be based on a "depraved heart" theory, as it does not

require a finding of an express intent that the child die. In two later cases, however, the court seemed to regard such intent as the critical element of malice, distinguishing murder from manslaughter. The first of these was *Regina v. Bubb and Hook*, 1851, 4 Cox C.C. 455, where the father of the four year-old victim (Hook) and the father's sister (Bubb), who undertook to run his household and care for the child, were accused of depriving the child of nourishment and clothing, from which she died. Bubb was charged with murder, Hook with manslaughter. In instructing the jury as to Bubb, Justice Williams, in the Gloucester Summer Assizes, said first:

"The indictment alleges, first, a duty on the part of the prisoner at the bar to supply the necessaries of life to the child whose death is the subject of the indictment. It alleges, secondly, a malicious neglect or omission to perform that duty; and it alleges, thirdly, that that omission or neglect resulted in the death of the child. If these three propositions are made out to your satisfaction, it will be your painful duty to find that the whole charge against the prisoner is substantiated, and you will say that she is guilty."

*Id.* at 458. He then proceeded to expound further on the requirement of malice:

"If the omission or neglect to perform the duty was malicious, then the indictment would be supported, and the crime of murder would be made out against the prisoner; but if the omission or neglect were simply culpable, but not arising from a malicious motive on the part of the prisoner, then, though it would be your duty to find her guilty, it should be manslaughter only."

*Id.* at 459.

Finally, and most significantly, he defined what was meant by malice:

"If the omission to supply necessary food or raiment was accompanied with an intention to cause the death of the child, or to cause some serious bodily injury to it, then it would be malicious in the sense imputed by this indict-

ment, and in a case of this kind it is difficult, if not impossible, to understand how a person who contemplated doing serious bodily injury to the child by the deprivation of food, could have meditated anything else than causing its death. You will therefore probably consider that the question resolves itself into this—Did the prisoner contemplate, by the course she pursued, the death of the child? If she did, and death was caused by the course she pursued, then she is guilty of murder. But if you are not satisfied that she contemplated the death of the child, then, although guilty of a culpable neglect of duty, it would amount only to the crime of manslaughter."

*Id.*

It seems evident from this instruction that the case was not based at all on a "depraved heart" theory but rested rather on whether the defendant intended that the child should die. *See also Regina v. Handley,* 1874, 13 Cox C.C. 79, 80–81, involving the death of an infant, where Justice Brett, sitting at the Worcester Winter Assizes, opined that if the defendant (mother) "made up her mind that the child should die, and ... with intent that it should die, left it to die, and it did so in consequence, she would be guilty of murder," but that if she "had not made up her mind that the child should die" but took charge of the child and "after having assumed such a care and charge she allowed the child subsequently to die from her wicked negligence, that would make her guilty of manslaughter." This seems to have excluded a "depraved heart" theory.

In two subsequent cases, the court appeared to move away from an express intent requirement and return to a willful vs. negligent distinction. In *Regina v. Conde and Conde,* 1867, 10 Cox C.C. 547, for example, Baron Channell, sitting in the Central Criminal Court, instructed the jury:

"If the prisoners or either of them wilfully withheld necessary food from the deceased, with a wilful determination by withholding sustenance which was requisite to cause his death, then the party so withholding such food is guilty of murder. If, however, the prisoners had the

means to supply necessaries, the want of which had led to the death of the deceased, and having the means to supply such necessaries, negligently, though not wilfully, withheld food which, if administered, would have sustained life, and so caused the death of the deceased, then that would amount to the crime of manslaughter in the person so withholding the food."

*Id.* at 549.

Finally, for our purposes, in *Gibbins and Proctor,* 1918, 13 Cr.App.Rep. 134, the court affirmed murder convictions against the father of a seven year-old victim and the father's paramour for causing the child to starve to death. As to the paramour, Proctor, who had undertaken the obligation to provide for the child, the court, quoting from the earlier case of *Instan,* 1893, 1 Q.B. 450, 17 Cox C.C. 602, declared that Proctor had a legal duty to the child that she "willfully and deliberately left unperformed, with the consequence that there has been an acceleration of the death of the deceased owing to the non-performance of that legal duty," and that a verdict of manslaughter "at least was inevitable." 13 Cr.App.Rep. at 139. Given the further evidence that "she had plenty of money," that "she kept the child upstairs insufficiently supplied with food," that "she hated the child and hit her," and that she participated in an attempt to cover up the child's death, the court concluded. that "there was evidence which justified the jury in returning a verdict against her, not merely of manslaughter, but of murder." *Id.* at 140.

The murder conviction against Gibbins was upheld on the theory that he knew what was happening and "did not interfere in what was being done." *Id.* at 139. The court noted: "He is in this dilemma: if he did not see her the jury might well infer that he did not care if she died; if he did he must have known what was going on." *Id.*

As we indicated, the American cases, particularly, the earlier ones, often cited some of these English cases in defining the distinction between murder and manslaughter. Unfortunately, in light of the language used in those cases,

they were occasionally cited for two somewhat different principles. *Bubb, supra,* 4 Cox C.C. 455, and *Handley, supra,* 13 Cox C.C. 79, made the distinction between murder and manslaughter based on whether the defendant intended for death to occur, whereas *Walters, supra,* Car. & M. 164, *Conde, supra,* 10 Cox C.C. 547, and, to some extent, *Gibbins and Proctor, supra,* 13 Cr.App.Rep. 134, spoke in terms of whether the withholding of sustenance was willful or negligent. It may be that the various judges meant to express the same concept, i.e., that the withholding is willful only if death is the intended, rather than merely the consequential, result, but that isn't entirely clear, and some American cases and commentators began to stress the willful/negligent distinction rather than whether death was intended.

In *Lewis v. State,* 72 Ga. 164, 53 Am.Rep. 835 (1883), a case arising from the death of a 10 year-old child, in part through starvation and exposure, the issue on appeal was whether the evidence supported murder as opposed to manslaughter. Citing Lord Campbell's statement in *Regina v. Hughes, supra,* 7 Cox C.C. at 302, and Roscoe Cr.Ev. 723, the court affirmed the murder conviction, stating in relevant part, "Death ensuing in consequence of the willful omission of a duty will be murder; death ensuing in consequence of the negligent omission of a duty will be manslaughter" and

> "[w]here a sick or weak person is exposed to cold with an intent to destroy him, this may amount 'to willful murder, under the rule that he who willfully and deliberately does any act which apparently endangers another's life and thereby occasions his death shall, unless he clearly prove to the contrary, be adjudged to kill him of malice *prepense.*' "

53 Am.Rep. at 836. Similarly, in *Pallis v. State,* 123 Ala. 12, 26 So. 339 (1899), involving the abandonment and exposure of an infant who, fortunately, was rescued, the court affirmed a conviction of assault with intent to murder, adopting this principle from 2 Bish.New Cr.Law, § 686:

"If the exposure or neglect of an infant or other dependent person, resulting in death, is an act of mere carelessness, wherein danger to life does not clearly appear, the homicide is only manslaughter; whereas, if the exposure or neglect is of a dangerous kind, it is murder. For example, if from an infant of tender years the person under obligation to provide for it willfully withholds needful food or any other needful thing, *though not with intent to kill,* and by reason thereof the child dies, he commits murder."

(Emphasis added.) *See also State v. Barnes,* 141 Tenn. 469, 212 S.W. 100, 100–01 (1919), explaining:

"If one owes to another a plain particular and personal duty, imposed either by law or by contract, an omission, resulting in the death of the party to whom such duty was owing, usually renders the delinquent party guilty of a homicide.

.     .     .     .     .

As to whether a parent so neglecting his child is guilty of murder or manslaughter would depend on the circumstances. If the neglect be willful or malicious, it is probably a case of murder. If the omission is not malicious, and is a mere case of negligence, the parent is perhaps guilty of manslaughter only."

and Annotation to *Johnson v. State,* 66 Ohio St. 59, 63 N.E. 607 (1902) in 61 L.R.A. at 290 (1903); *Gibson v. Commonwealth,* 106 Ky. 360, 50 S.W. 532 (1899).

A number of American cases continue to speak in terms of whether the deprivation was with the intent that death ensue, although often in those cases there was some direct evidence indicating that actual intent. *See, for example, Harrington v. State,* 547 S.W.2d 616 (Tex.Cr.App.1977); *Harrington v. State,* 547 S.W.2d 621 (Tex.Cr.App.1977). Most courts, however, look more to whether the deprivation was knowing and willful, tacitly, perhaps, inferring an intent from the inevitable consequence of the deprivation but not requiring proof of an express intent to kill the

child.[1]  In *Commonwealth v. Hall*, 322 Mass. 523, 78 N.E.2d 644, 647 (1948), the court, citing Lord Campbell's statement from *Regina v. Hughes, supra*, 7 Cox C.C. at 302, and declaring it "supported by numerous authorities in England and in the United States," sustained a second degree murder conviction and held:

"The jury could have found on the foregoing evidence that the baby died of starvation and dehydration resulting from the intentional conduct of the defendant in placing it in the attic and withholding food and liquids from it.

---

1. The "depraved heart" theory, as Perkins points out, rests on the premise that "an act may involve such a wanton and wilful disregard of an unreasonable human risk as to constitute malice aforethought even if there is no actual intent to kill or injure." R. Perkins, *Criminal Law* (1957) at 32. The early cases, he suggests, continued to look for an intent to kill but found it "implied" from the defendant's conduct. "Now," he continues, "as previously mentioned, this fiction is abandoned and it is frankly stated that such a reckless and wanton disregard of an obvious human risk is with malice aforethought even if there was no actual intent to kill or injure." *Id.*

In his classic work on the common law, Holmes notes:
"Malice, in the definition of murder, has not the same meaning as in common speech, and, in view of the considerations just mentioned, it has been thought to mean criminal intention. . . .

But intent again will be found to resolve itself into two things; foresight that certain consequences will follow from an act, and the wish for those consequences working as a motive which induces the act. The question then is, whether intent, in its turn, cannot be reduced to a lower term. Sir James Stephen's statement shows that it can be, and that knowledge that the act will probably cause death, that is, foresight of the consequences of the act, is enough in murder as in tort.

For instance, a newly born child is laid naked out of doors, where it must perish as a matter of course. This is none the less murder, that the guilty party would have been very glad to have a stranger find the child and save it. . . ."
O. Holmes, *The Common Law* (1881) at 53.
Unfortunately, some of this legal schizophrenia persists even in later cases. In *Faulcon v. State*, 211 Md. 249, 257, 126 A.2d 858 (1956), for example, the Court defined murder as the unlawful killing of a human being with malice aforethought, concluded that malice may be inferred "when one wilfully does an act, the natural tendency of which is to cause death or great bodily harm," but then said that "[f]or a homicide to be 'wilful' there must be a specific purpose and design to kill." In the context of the *Faulcon* case, the Court's definition of

While the precise question seems never to have been decided in this Commonwealth, we have no doubt that such conduct in the circumstances obtaining here would constitute murder at common law."

*See also De Leon v. State,* 684 S.W.2d 774, 776 (Tex.Ct.App. 1984), where, citing *Harrington v. State, supra,* 547 S.W.2d 616, the court held that "[t]he omission by a parent to perform his statutory parental duty which results in the death of the child, if done intentionally and knowingly, is murder." A similar pronouncement was made in *State v. House,* 260 Or. 138, 489 P.2d 381, 384 (1971): "[T]he killing of an infant child by the wilful and deliberate failure and refusal of its parents to provide food, medical and hygienic care during it short life can constitute the crime of murder...."

Several courts have affirmed murder convictions based expressly on an "implied malice" or "depraved heart" theory. *See State v. Nicholson,* 585 P.2d 60 (Utah 1978); *People v. Burden,* 72 Cal.App.3d 603, 140 Cal.Rptr. 282 (1977); *cf. State v. Crocker,* 435 A.2d 58 (Me.1981) (upholding a murder conviction on a "depraved indifference" theory where the defendant knocked his stepson unconscious and then left him untreated and/or withheld food from him). *Compare Biddle v. Commonwealth,* 206 Va. 14, 141 S.E.2d 710, 714 (1965), and *People v. Sika,* 138 A.D.2d 935, 526 N.Y.S.2d 683, *appeal denied,* 72 N.Y.2d 866, 532 N.Y.S.2d 516, 528 N.E.2d 907 (1988) (finding insufficient evidence that the conduct at issue was malicious). *See, generally,* Annotation, *Homicide By Withholding Food, Clothing, Or Shelter,* 61 A.L.R.3d 1207 (1975); Annotation, *Validity And Construction Of Statute Defining Homicide By Conduct Manifesting "Depraved Indifference",* 25 A.L.R.4th 311, § 8 (1983).

■ Most of these cases—English and American—tend to be fact-specific. It is evident from all of them that mere

---

"willful" was not inappropriate. We do not regard it as negating the "depraved heart" theory of murder, however.

neglect, despite its awful consequence, is not enough to establish malice and thus to support a conviction of murder. We believe, however, that, by applying the rules enunciated in *Robinson v. State, supra,* 307 Md. 738, 517 A.2d 94, the court's finding of malice in this case is supported by the evidence. Where a young child, incapable of self-help, is knowingly, deliberately, and unnecessarily placed in confinement and left alone for up to five days without food, drink, or attention and death ensues from that lack, malice may be inferred. A rational trier of fact could reasonably find that death is at least a likely, if not a certain, consequence of such conduct, that any normal adult would understand and appreciate the likelihood of that consequence, and that the conduct is therefore willful and wanton, manifesting "viciousness or contemptuous disregard for the value of human life...." Gilbert & Moylan, *supra,* at 21. This is essentially a restatement of the view expressed by Justice Coltman 150 years ago in *Regina v. Walters, supra,* Car. & M. 164, which we believe to be an accurate statement of the current law.

In urging that their conduct over that fateful December weekend amounted only to neglect and not to wantonness, appellants point to what they regard as "indisputable evidence that long term care was provided for Brandy," which, they say is "impossible to reconcile" with ill-will. Moreover, they stress evidence that "there was no specific assignment of responsibility" between them for Brandy's care, and that her neglect arose from the fact that they were too busy arguing with each other that weekend to care for their child. We reject both of these arguments as utterly specious. In the first place, there was no "indisputable evidence" that either defendant provided reasonable long-term care for Brandy. There is no evidence that Mr. Simpkins provided any care at all for her, and Dr. Branson's testimony showed, at best, a rather cavalier and uncaring attitude on the part of Ms. Geisler as to Brandy's health and welfare. Indeed, as noted in our discussion below of Ms. Geisler's statement, there was evidence that she was

aware of Brandy's condition on December 17—the day before the child was discovered dead—but did nothing to help her. As to assignments of responsibility, the law itself imposes a duty on *both* parents to care and nurture their minor children. Md.Fam.Law Code Ann. § 5-203(b) makes the parents of a minor child "jointly and severally responsible for the child's support, care, nurture, welfare, and education." Subject to supervening court orders, they may decide by agreement who, if either, shall be the primary care-giver, but the ultimate legal responsibility for the required care is and remains on them both. The evidence here fully justified the verdict.

### *Ms. Geisler's Statement*

■ Ms. Geisler, along with Mr. Simpkins and Mr. Monte, was taken to the police station at about 2:30 on the afternoon of December 18. At that time, the police had no idea of the cause of Brandy's death, and none of the three persons were either suspects or under arrest. They remained together in a visitor's waiting room except during periods when the detectives interviewed one or another of them. Ms. Geisler was first formally interviewed at about 5:00 by Detective Hagin. Because there was no evidence of criminality at that point, she was not given the warnings specified in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When the interview was completed, at about 6:30, Hagin began to make arrangements for Ms. Geisler and the others to be returned home. That changed, however, when, at about 7:00, the police were informed by the medical examiner's office that Brandy had died of malnutrition and dehydration.

With this information, Detective Hagin brought Ms. Geisler into the interview room, which was unlocked, for another interview. This time, he gave her the *Miranda* warnings which upset her to the point that he left the room and turned the interrogation over to Detective Tomlin. Just after advising Ms. Geisler of her rights, Detective Hagin had shown her some photographs of Brandy. Eventually,

Ms. Geisler gave two very brief statements, one at 8:10 and one at 8:20 or 8:30. In the second of these statements, she acknowledged that Brandy "looked bad" the day before, that "her eyes were baggy and dark, and her eyes were glassy," and that she intended to take the child to the hospital but did not because she had to take Heather to school "and then I had to go shopping."

The court suppressed the statements made by Ms. Geisler before the *Miranda* warnings were given but admitted the two later statements. She now complains that they were involuntary, being tainted both by the suppressed pre-*Miranda* statement and the display of the photographs. We find no basis for that complaint. As to the photographs, Detective Hagin testified that they were shown to her in order to respond to questions raised by Ms. Geisler. Based on his observation of lividity—the settling of blood in the body after death—the medical examiner had concluded that Brandy's body was not in the same position when first observed by the police as when she died, and the detective inquired about that. Ms. Geisler, he said, did not seem to understand what he was talking about—what lividity meant—and so he showed her the photographs which indeed illustrate the lividity.

In responding to an attack on the voluntariness of a statement, we must make an independent constitutional appraisal of all the circumstances surrounding the giving of the statement. Here, we have no doubt that the court was correct in ruling the statement admissible. There was no evidence of coercion or inducement, of an over-bearing of Ms. Geisler's will. The interrogations were brief and, until the final one, which lasted only about an hour, she was not even a suspect. With respect to the photographs, although under some circumstances the display of that kind of material might be coercive, it clearly was not in this instance.

### Increase in Sentence

■ The written transcript of the sentencing hearing reflects that, in pronouncing appellant Simpkins' sentence, the trial court stated:

"It is the judgment of the court that the defendant be sentenced to the jurisdiction of the Commissioner of Corrections for a period of thirty years. *I hereby suspend all but five years* of that sentence and order him placed on probation for a period of five years." [2]

(Emphasis added.) About ten minutes later, the court explained: "I am advised that people in the courtroom heard me say all but five years suspended. At no point was my intention to impose a sentence of five years. At all times it was my intention to impose a twenty-five year sentence." The court clarified that appellant Simpkins "was sentenced to the jurisdiction of the Commissioner of Corrections for a period of thirty years, all but twenty-five years suspended." Simpkins now contends that the trial court illegally increased his sentence. Our resolution of this issue hinges on what happened during the ten-minute interval.

Maryland Rule 4–345(b) directs that, in exercising its revisory power over a sentence, a trial court "may modify or reduce or strike, but may not increase, a sentence." In *State v. Sayre*, 314 Md. 559, 565, 552 A.2d 553 (1989), the Court of Appeals held that "under Rule 4–345(b), once sentence has been imposed, there can be no inquiry into intention or inadvertence." In general, a sentence is deemed "imposed" when "the court indicates that the particular case before it is terminated, as by calling, or directing the clerk to call, the next case." *Sayre*, 314 Md. at 565, 552 A.2d 553. *See Brown v. State*, 83 Md.App. 24, 33–35, 573 A.2d 403 (1990) (where the defendant remained standing before the court as it pronounced, then increased, the sentence, Rule 4–345(b) was not offended). In the case before us, the question is whether appellant Simpkins' sentence had been "imposed" when the court increased it.

There is no notation or break in the written transcript of the sentencing hearing that would indicate that the proceeding terminated after the original pronouncement of sen-

---

**2.** The court sentenced appellant Geisler to 30 years in prison with ten years suspended in favor of five years probation.

tence, and that the increase was made during a second proceeding. A careful reading of the transcript, however, indicates that that is exactly what happened. The transcript shows that, after the court pronounced both appellants' sentences, defense counsel advised the appellants of their rights to appeal. Immediately thereafter, the prosecutor stated that she was *"recalling* State versus Grace [C]atherine Geisler and [Alan] William Simpkins...." (Emphasis added.) The court then commented: "All right, after *conclusion of the sentencing,* the counsel approached the bench and questioned the court regarding its sentence." (Emphasis added.) It went on to increase appellant Simpkins' sentence. Even though the original pronouncement of sentence and the subsequent increase are reflected on consecutive pages of the transcript, notations on the pages indicate that at least ten minutes elapsed between the two events.

Although the State contends that the sentencing hearing was not over when the court announced the increase, it concedes a number of facts in its brief that indicate otherwise. The State points out that the sentencing hearing was videotaped and admits that the tape shows that, after the original pronouncement of sentence, "both [appellants] were led out of the courtroom in the sheriff's custody" and "Simpkins' counsel ... asked to be excused and the court indicated in the affirmative." According to the State, the videotape was then "temporarily discontinued" and an unrecorded bench conference took place. The recording resumed about ten minutes later, with the prosecutor "recalling" the case.

Based on the comments appearing in the written transcript and on the State's uncontroverted summation of the unrecorded events, it is clear that sentence was "imposed" before the court increased it. Rule 4–345(b), therefore, bars the increase.

JUDGMENT AS TO APPELLANT GEISLER AFFIRMED; CONVICTION AS TO APPELLANT SIMPKINS AFFIRMED BUT SENTENCE VACATED AND RE-

MANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF SENTENCE AS FIRST IMPOSED; COSTS TO BE PAID TWO–THIRDS BY APPELLANTS AND ONE–THIRD BY MAYOR AND CITY COUNCIL OF BALTIMORE.

MOTZ, J., concurs.

MOTZ, Judge, concurring.

I agree with the analysis and conclusions contained in the well reasoned majority opinion, including the holding that *State v. Sayre*, 314 Md. 559, 552 A.2d 553 (1989), prevents us from upholding the sentence ordered by the court below. I write separately only to suggest that this case may present an excellent opportunity for the Court of Appeals to reconsider its holding in *Sayre*. It is, to me, unconscionable that the sentencing judge's inadvertent mistake, corrected within ten minutes, should prevent Brandy Simpkins' murderer from receiving the punishment that he so clearly deserves.

The *Sayre* majority's rigid interpretation of Maryland Rule 4–345(b), as pointed out by Judge Rodowsky, in dissent, makes sense when "some appreciable period of time from the imposition of the sentence" has passed. *Id.* at 570, 552 A.2d 553 (Rodowsky, J. dissenting). Imposition of this bright line rule, however, is harsher than necessary or appropriate when there has been no lapse of an appreciable period of time and it is clear that the sentencing judge simply seeks to correct an obvious mistake in sentencing.[1]

---

1. Although the mistake in sentencing here is not the "slip-of-the-tongue" variety found in *Sayre*, it is, it seems to me, just as obvious. Here, Mr. Simpkins and Ms. Geisler were tried, convicted and then sentenced together. Of the two, Ms. Geisler, even though erratic, irresponsible, and cavalier in her treatment of Brandy, at least showed more concern than Mr. Simpkins, the child's father. Accordingly, it seems inconceivable that the judge intended to sentence Ms. Geisler to twenty years imprisonment and at the very same time, in almost virtually the same breath, sentence Mr. Simpkins to only five years imprisonment.

In *Green v. United States*, 363 A.2d 979 (D.C.1976), the District of Columbia Court of Appeals permitted a trial court to revise a sentence it had incorrectly rendered an hour earlier. Acknowledging the "well settled" principle that under the Fifth Amendment prohibition against double jeopardy a sentence cannot be increased after a defendant has begun serving it, *id.* at 980 (*citing United States v. Evans*, 459 F.2d 1134 (D.C.Cir.1972)), the court nevertheless refused to hold that a defendant who was housed temporarily in a courthouse cell had begun serving his sentence. *See also Thomas v. United States*, 388 A.2d 1231 (D.C.1978) (court permitted to increase mistaken sentence seven hours after it was delivered, where defendant was confined for seven hours in courthouse holding cell and had not been "delivered" for execution of his sentence). Moreover, since the Supreme Court in *United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), revoked that "well-settled" rule against increases in sentences after a defendant begins serving time, courts have been afforded even more flexibility in correcting their sentencing errors. *See, e.g., United States v. Jefferson*, 714 F.2d 689, 707 (7th Cir.1983) ("it is not inconsistent with the Double Jeopardy Clause for a defendant to be resentenced upon remand according to the original intentions of the trial judge, even if this entails enhancement of one or more of the original sentence.")

I recognize, as Judge Rodowsky did, that the *Sayre* holding was found to be required by Rule 4–345, not by double jeopardy principles. Nevertheless, I do not see how justice is served by a strict and uncompromising interpretation of Rule 4–345, which goes far beyond the confines of constitutional requirements, when the very purpose of that rule is to further the principles espoused by the Fifth Amendment.