COMMONWEALTH *vs.* GLADYS M. HALL.

Middlesex.      December 1, 1947. — March 31, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, WILKINS, & SPALDING, JJ.

*Homicide. Parent and Child. Bastardy. Pleading, Criminal,* Indictment.

The mother of an illegitimate child is under a primary duty at common law to provide for its support and maintenance, and is relieved of that duty only to the extent that aid can be obtained from its father under G. L. (Ter. Ed.) c. 273, § 15.

A verdict that the mother of a normal illegitimate child about two months of age was guilty of murder in the second degree was warranted by evidence justifying findings that the mother, having the capacity and means of providing for the child, intentionally withheld food and fluids from it for about forty-eight hours, whereby it died of starvation and dehydration.

Section 79 of G. L. (Ter. Ed.) c. 277 does not purport to deal with substantive law, nor require that one guilty of conduct warranting a conviction of murder in the second degree be found guilty only of manslaughter merely because his conduct falls within the description in the form therein of indictment for statutory "manslaughter by negligence."

INDICTMENT, found and returned on November 8, 1946. The indictment was tried before *Kirk*, J.

*J. E. Henchey,* (*C. R. McCauley, Jr.,* with him,) for the defendant.

*L. C. Sprague*, Assistant District Attorney, for the Commonwealth.

SPALDING, J. The defendant was convicted of the murder in the second degree of her daughter Jane Doe Hall. The case comes here on an appeal with an assignment of errors, a summary of the record, and a transcript of the evidence, as required by G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended by St. 1939, c. 341. There were in all thirty-one assignments of error. Assignments 1 to 27, inclusive, have not been argued and some of them are expressly waived. Of those remaining it is necessary to consider only the thirtieth, which relates to the denial of the defendant's motion for a "directed verdict of not guilty of murder in the second degree." [1]

There was evidence tending to show the following: The defendant, who was twenty-four years of age and unmarried, lived with her father and brother in Woburn. She was the mother of two illegitimate children, a son, David, aged two, and a daughter born on August 18, 1946, to whom no name was given. The children lived with the defendant. The daughter was born at the Choate Memorial Hospital in Woburn. Two days after the birth of the daughter the defendant left the hospital and returned home. Two or three days later one Linscott, the chairman of the board of health and charities of the city of Woburn, and Gorman, an agent of the board, called on the defendant to see what was to be done with her child who was still at the hospital. The defendant was asked whether she was married and she stated that she was. She refused, however, to divulge the name of the child's father or to furnish any information as to his whereabouts. When told by representatives of the board that it was customary to approach the father to see what he was going to do toward bringing up the child she replied, "What is the matter with the city of Woburn bringing it up? What do we pay taxes for?" Linscott then

---

[1] The other assignments relate to the denial of the following motions of the defendant: motion for direction of verdict of not guilty (assignment 28), motion for direction of verdict of not guilty of manslaughter (assignment 29), and motion for direction of verdict of not guilty of murder in the first degree (assignment 31).

said to the defendant, "if you want us to do something about it you will have to work along with us." He suggested that she think the matter over and if she changed her mind to get in touch with them and they would do what they could. Linscott never heard from her again.

Ten days after its birth the baby was discharged from the hospital and was entrusted to the care of the defendant. At birth the child was normal and weighed nine pounds and four ounces. While it was at the hospital it "progressed normally" and at the time it was discharged it was in good health. At that time the defendant was given a formula for feeding the baby by the doctor who had delivered the child and had cared for it since birth.

On September 3 the child was brought by the defendant to a doctor specializing in pediatrics for examination. The doctor was told that the child was losing weight and that it was having six watery stools a day. The child, however, was found to be normal, and the defendant was given a new formula which was slightly different from the one she had been using. The defendant was told to return on September 23 but she did not do so.

On Thursday, October 24, 1946, shortly after 11:00 A.M., one Reil, a police officer of the city of Woburn, accompanied by Miss Reynolds, a nurse of the board of public welfare, went to the house where the defendant lived. The defendant, who answered the door, said to the officer, "Now, who is complaining of me?" The officer informed the defendant that he had a warrant to take the two children to the city infirmary by reason of a complaint charging neglect. The defendant told the officer that he could take the baby but not the boy; Officer Reil then asked her where the baby was, and she said that it was in the home of a friend in Rhode Island. When asked the address of her friend, she stated that she did not know. The officer, after talking with the defendant's father, who was nearby, told the defendant that someone was lying and that he had received information that the baby was in the house on the previous Monday. He then told the defendant that he was going to search the house from the cellar to the attic. Thereupon the defend-

ant told the officer that the baby was up in the attic. In reply to a question whether the baby was alive or dead the defendant stated that she did not know. She stated that she had put the child in the attic Tuesday morning and had not gone to see it since that time. She said that she had heard the child crying Tuesday afternoon, but "had no food and no formula to give it." The defendant told the officer that she had applied to certain charitable organizations for assistance but had received no aid. There was evidence that she had never requested assistance from these organizations.

The nurse and the officer then proceeded to the attic where they found the dead body of the baby lying on the floor wrapped in blankets; it appeared to be "very, very thin," and "bones were showing through the body." The officer then went downstairs and talked with the defendant. When he told her the child was dead, she turned to her brother who was standing nearby, swore at him and said, "you said you would get me, and this is what you did." During her conversation with the officer the defendant remarked several times, "Rose Carlan from Chelsea got away with it."

Later that day (October 24) the defendant made a statement to a State detective which included the following: About eight or nine days earlier she had put the child in the attic, bringing it downstairs from time to time in order to feed it. The baby was losing weight and was starving to death because it was not getting the proper food. The formula called for some syrup, but she had run out of it and was unable to get any money from her brother or father to buy more. The cost of the syrup was about sixty-nine cents. Groceries for the house were purchased by her at the grocery store and were paid for by her father. They also received four quarts of milk a day which were paid for by her father. The baby was last fed by her at 1 A.M. Tuesday. On Tuesday afternoon the defendant heard the baby crying but did not go up to see it. On that same afternoon the defendant with her son David went to the stores to do some shopping. She had $5 or $6 which her father had given her to buy some clothing for David. Failing to find what she

wanted, she purchased some curtain rods. She did not purchase syrup for the baby because "she didn't think of it." She was getting so many complaints from her brother and father about the noise the baby was making that "she was sick and tired of it all." Asked whether she had put the baby in the attic for the purpose of having it die, the defendant replied, "I guess so."

There was medical evidence of the following: The baby's body when found was extremely emaciated and its weight was five pounds. There were numerous scratches, abrasions and bruises about the face and head, and on the heels and the buttocks there were deep, extensive lacerations similar to bed sores. There was a fracture two to three inches long on the right side of the skull.[1] No evidence of disease was discovered in an examination of the baby's vital organs. No food particles were found in the stomach or intestines. The cause of death was "starvation and dehydration"; the former resulted from lack of food and the latter from lack of fluids. It was estimated that the child had been dead "some time over eight hours" before it was found. On the child's face and clothing approximately five grams of salt were found which indicated that the child had shed tears amounting to between a pint and a quart. In a healthy child this would have taken from twelve to twenty-four hours, and in a sickly child who had not received adequate fluid a longer period would have been required. There was no evidence of vomit on the child's face or on the blanket, and "there was no evidence whatsoever of diarrhoea."[2]

The judge rightly denied the defendant's motion for a "directed verdict of not guilty of murder in the second degree." The jury could have found on the foregoing evidence that the baby died of starvation and dehydration resulting from the intentional conduct of the defendant

---

[1] The scalp was removed during the autopsy, and while there was some evidence of bleeding there was no evidence of brain injury; it was the opinion of the doctors who testified for the Commonwealth that the fracture had nothing to do with the baby's death.

[2] The defendant testified that the baby vomited a great deal and had chronic diarrhoea. There was medical evidence introduced on behalf of the defendant that vomiting and diarrhoea could cause death by starvation and dehydration even if a child were regularly fed.

in placing it in the attic and withholding food and liquids from it. While the precise question seems never to have been decided in this Commonwealth, we have no doubt that such conduct in the circumstances obtaining here would constitute murder at common law.[1] In *Regina* v. *Hughes,* 7 Cox C. C. 301, Lord Campbell, C.J., said, "But it has never been doubted that if death is the direct consequence of the malicious omission of the performance of a duty (as of a mother to nourish her infant child) this is a case of murder. If the omission was not malicious and arose from negligence only, it is a case of manslaughter" (page 302). This statement is supported by numerous authorities in England and in the United States. *Regina* v. *Bubb,* 4 Cox C. C. 455. *Regina* v. *Conde,* 10 Cox C. C. 547, 549. *Regina* v. *Handley,* 13 Cox C. C. 79. *Rex* v. *Gibbins,* (1918) 13 Cr. App. Rep. 134. *Lewis* v. *State,* 72 Ga. 164. *State* v. *Barnes,* 141 Tenn. 469. *Gibson* v. *Commonwealth,* 106 Ky. 360. *Pallis* v. *State,* 123 Ala. 12. See annotation in 61 L. R. A. 290. See also Bishop on Criminal Law (9th ed.) § 686; Wharton's Criminal Law (12th ed.) § 485.

By the law of this Commonwealth the defendant was under a duty to provide for the support and maintenance of her child notwithstanding its illegitimacy. It was said by Parsons, C.J., in *Wright* v. *Wright,* 2 Mass. 109, 110, "In legal contemplation, a bastard is generally considered as the relative of no one. But, to provide for his support and education, the mother has a right to the custody and control of him, and is bound to maintain him, as his natural guardian." Similar statements may be found in *Commonwealth* v. *Cole,* 5 Mass. 517, 518, *Somerset* v. *Dighton,* 12 Mass. 383, 387, and *Petersham* v. *Dana,* 12 Mass. 429, 433. See *Purinton* v. *Jamrock,* 195 Mass. 187, 199, 201. The statute (G. L. [Ter. Ed.] c. 273, § 15) which requires the father "to contribute reasonably to . . . [the] support and maintenance" of his illegitimate offspring does not relieve the mother of her common law obligation. The primary duty is on the mother, and she is relieved of that duty only

---

[1] In view of the verdict there is no occasion to consider whether the evidence would have warranted a verdict of murder in the first degree.

to the extent that aid can be obtained from the father. See *Commonwealth* v. *Cole*, 5 Mass. 517, 518; *Commonwealth* v. *Callaghan*, 223 Mass. 150, 151; *Commonwealth* v. *Dornes*, 239 Mass. 592, 594.

To render criminal the defendant's omission to discharge the duty owed to the child she must have had the capacity and means of performing it. *State* v. *Noakes*, 70 Vt. 247, 262. *Rex* v. *Saunders*, 7 C. & P. 277. *Regina* v. *Bubb*, 4 Cox C. C. 455. *Regina* v. *Conde*, 10 Cox C. C. 547, 549. *Rex* v. *Gibbins*, (1918) 13 Cr. App. Rep. 134, 139. There was evidence which would have warranted the jury in finding that the defendant's physical condition was such, despite her testimony to the contrary, that she was able to take care of the child after she returned from the hospital. And the jury could have found that the defendant, although dependent on her father for support, had the means of providing for the child. On the day when, as the defendant admitted, she ceased feeding the child because of lack of food, she nevertheless had $5 or $6, and her only explanation for not using part of this to buy syrup for the baby's formula was that "she didn't think of it." Moreover, apart from the fact that the jury could have found that the defendant had the means to provide for the child, they also could have found that she could have obtained the small amount of food necessary to sustain its life had she applied to one or more of the numerous public or private welfare organizations which are available for such aid. It could have been found that the defendant never applied to any private or public welfare organization for assistance and that her testimony to the contrary was not true. Indeed there was evidence that during the month of September, 1946, a representative of a welfare agency called on the defendant and offered her assistance but it was refused.

The defendant argues that G. L. (Ter. Ed.) c. 277, § 79, manifests a legislative intent that conduct such as is disclosed by this record should constitute only manslaughter and not murder in any degree. We cannot agree. Section 79 provides a schedule of forms of indictments which "shall be sufficient in cases to which they are applicable." Among

the forms set forth in the schedule is the following: "Manslaughter by negligence. — That A. B., being under the legal duty, and being of sufficient ability to provide C. D., who was his wife, with sufficient food and drink for her sustenance and maintenance, did neglect and refuse so to do; by reason whereof said C. D., being unable to provide sufficient food and drink for herself, became and was mortally sick and died." This statute does not purport to deal with substantive law. It merely provides forms of indictment in certain cases and permits "any other form of indictment or complaint authorized by law" to be used.

We assume in the defendant's favor, without deciding, that an indictment for murder is none the less "a capital case" after a verdict of guilty in the second degree and thus within the scope of the second paragraph of G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341. See *Commonwealth* v. *Venuti*, 315 Mass. 255, 262; *Commonwealth* v. *Kavalauskas*, 317 Mass. 453, 460. We have therefore examined the whole case including the questions presented by the assignments of error which have not been argued, and are satisfied that justice does not require a new trial for any reason.

*Judgment affirmed.*