## COMMONWEALTH *vs.* PAUL LASHAWN FICKLING.

Hampden. February 9, 2001. - April 20, 2001.

Present: GREANEY, SPINA, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Required finding, Instructions to jury, Presumptions and burden of proof, Capital case. *Evidence,* Prior misconduct, State of mind, Intent.

Evidence at a murder trial that the defendant abandoned his twenty-two month old child alone in a locked apartment without food or drink, as a result of which the child died, was sufficient to permit a rational jury to find beyond a reasonable doubt that the defendant had committed murder in the first degree by extreme atrocity or cruelty. [13-15]

Evidence at a murder trial of the defendant's violent conduct toward the victim occurring within fifteen months of the murder was properly admitted to show the defendant's state of mind, motive, intent, and relationship with the victim, all live issues at trial. [15-17]

At a murder trial, the judge's incorrect instructions to the jury on the issue of provocation did not create a substantial likelihood of a miscarriage of justice in circumstances in which he also gave two strong correct instructions, which the judge made clear carried more weight than the erroneous instructions. [18-20]

At a murder trial, there was no error in the judge's instructions on malice aforethought that created any substantial likelihood of a miscarriage of justice. [20-22]

INDICTMENTS found and returned in the Superior Court Department on August 8, 1996.

The cases were tried before *Mary-Lou Rup*, J.

*Charles K. Stephenson* for the defendant.

*Marcia B. Julian*, Assistant District Attorney, for the Commonwealth.

CORDY, J. A jury convicted the defendant, Paul Lashawn Fickling, of murder in the first degree of both his infant daughter and her mother, by reason of extreme atrocity or cruelty. On appeal, the defendant claims that the judge erred in denying his motion for a required finding of not guilty on the indictment charging him with the murder of his daughter when only a

manslaughter charge was merited by the evidence. He also argues that the trial judge erred in admitting evidence of prior violent incidents between the defendant and the child's mother occurring as long as fifteen months before their deaths, and committed reversible error by improperly instructing the jury on the issue of provocation as it applies to voluntary manslaughter with respect to the mother, and on malice aforethought with respect to both victims. Last, he asks that we exercise our power under G. L. c. 278, § 33E, to reduce this conviction to manslaughter. We affirm the defendant's convictions and decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* We summarize the facts as the jury could have found them, in the light most favorable to the Commonwealth. *Commonwealth* v. *Sanna,* 424 Mass. 92, 93 (1997). On July 11, 1996, the police found the bodies of Amy Smith (victim) and her twenty-two month old daughter (hereinafter child or daughter) in their apartment on Dwight Street Extension in Springfield. The defendant was the child's father, but was not residing at that address. The victim's nude body was discovered in a closet, with her legs protruding. Her hands were bound to her chest, her face was covered by clothing and a stroller, and a sock was stuffed inside her mouth. An autopsy revealed that she died from asphyxia which could have been caused by strangulation due to a choke hold around her neck or suffocation due to the sock found in her mouth. The child's fully clothed body was found lying on a mattress near her mother. An autopsy determined that she had died from the combined effects of dehydration and starvation due to lack of water and food.[1]

Sergeant Larry Brown and Detective Anthony Pioggia of the Springfield police department examined the crime scene. They found no sign of forced entry or robbery. All of the kitchen windows, which bordered the rear porch (the customary entrance to the dwelling), were locked with the shades drawn. The door

---

[1]Two expert witnesses testified for the Commonwealth that the child would have remained conscious for two to three days prior to death, during which time she would have experienced worsening symptoms associated with this condition, including: thirst, weakness, irritability, delirium, lethargy, stupor, and impending coma.

to the rear porch was also locked by a deadbolt from the inside. The detectives discovered, in a kitchen drawer, a copy of a protective order that prohibited the defendant from having any contact with the victim and her daughter.

Soon after the police arrived, a local television station broadcast the names of the victims and the location of the murder scene. Responding to this broadcast, Brown dispatched officers to locate the defendant, who arrived at the scene while the search was underway. The defendant approached the rear porch door, where two officers were stationed, and angrily demanded to be admitted to the apartment to see his baby. The defendant, who was with two other young men, became aggressive and pushed one of the officers guarding the porch. He was then arrested on an unrelated outstanding warrant.

Detectives Pioggia and Raymond Muise began interviewing the defendant at the Springfield police department at approximately 7 P.M., following the defendant's signed waiver of his Miranda rights. He signed the waiver as "Shawn Fickling." When asked about the protective order, the defendant claimed it was directed at his twin brother Paul, who had "problems" with the victim. He also told them that the outstanding warrant on which he had been arrested was really against his twin brother, who was currently in jail.

Detective Pioggia left briefly to make inquiries about the alleged twin brother. When Pioggia returned and confronted the defendant with the fact that no such twin brother existed, the defendant admitted he did not have a twin brother, and then told the detectives that the protective order was issued against him after an incident that occurred when he and the victim lived together on Pearl Street in Springfield, prior to and shortly following their child's birth. The defendant stated that he struck the victim and that it was the only time that had happened. When asked if he could think of anyone who could have committed these crimes, the defendant mentioned a local street person. The defendant then proceeded to tell the detectives that he had last seen the victim one month before her death. When the police informed him that they had spoken to a person who could place him near the apartment a few days before her death, the defendant remembered that on July 6 he had been paged by

the victim, and had gone to her apartment to give her forty dollars for the baby.

The police subsequently established that the pager did not exist, and confronted the defendant with this and other inconsistencies in his story. Detective Muise testified that at approximately 10:25 P.M., the defendant "lowered his head, looked up at us, and said he did it; 'Excuse me, all right, I did it.' He said he hit her a couple of times, and then he choked her." The defendant then expressed surprise that he would be spending the rest of his life in jail for murder. Following this admission, a first written statement was taken.

The defendant provided the details of his relationship with the victim and stated that she had obtained a protective order because "a couple of times I slapped her." In addition, the defendant described his visit to her apartment on July 5, 1996, where he last saw her at about 6 P.M. According to the defendant, he was accompanied by a man named "Broadway."[2] When they arrived at the apartment, the defendant saw that the child was naked and had fecal matter on her legs. The defendant and the victim got into an argument as he cleaned the baby and diapered her. He stated that he did not put any clothing on the child.[3] As he finished cleaning the baby, the victim pushed him from behind, he fell forward, and "[his] face went mushing right into the shit." He was "real mad" and slapped her twice. According to the defendant's statement, the victim then grabbed a knife from the kitchen and swung it at him repeatedly. She cut his right wrist and right hand.[4] He grabbed her in a head lock and "squeezed her for about 2-3 minutes while she struggled with me." When he released her, she fell to the mattress and swore at him. He then left the apartment by the back door, after Broadway told him he was going to "stash" her. The defendant claimed that he next returned to the apartment on July 9, 1996, and knocked on her door. He could hear the television on inside

---

[2]"Broadway" was later identified by the defendant as John Belton. The police investigation uncovered evidence that provided Belton with an alibi from the evening of July 4 until the evening of July 6.

[3]As noted above, the baby's body was fully clothed when she was found.

[4]Three knives were seized from the kitchen by the detectives, and testing revealed no blood on the knives. The only blood found in the apartment was reported by expert testimony to be the product of decomposition.

the apartment. Two neighbors told him they had not seen the victim or her daughter for about one week.

The detectives confronted the defendant with evidence of inconsistencies in his first statement and, after being informed again of his Miranda rights, the defendant gave a second statement. In the second statement, he added that he remained in the apartment and saw " 'Broadway' hitting [the victim] after I let her go and stopped choking her." Broadway punched her in the face and head and "just went crazy."[5] He then held her lips shut, and she lapsed into unconsciousness. At this point the defendant claimed he walked outside to dispose of a soiled diaper. When he returned, he saw Broadway inserting his fingers into the victim's genitalia while fondling her breasts. She remained unresponsive. When Broadway was "finished" he told the defendant he was going to "stash" the victim, and he dragged her to a closet and placed her inside. At this point the defendant "got real scared" and left by the back door, followed by "Broadway" a few minutes later. The defendant was aware that he had left the child behind, but he claimed that he assumed someone would come in to get her through the unlocked back door.[6] The detectives, still believing the defendant was not being forthcoming, took an additional statement from him that was later made an addendum to the second statement.[7] The defendant said he went back to the apartment on July 9 because he knew that his child was there and that her mother was dead. He knocked, but did not try to enter because he did not wish to attract the attention of the neighbors.[8]

2. *Motion for a required finding of not guilty with respect to*

[5]A forensic chemist testified that, if the victim had been beaten in the manner described by the defendant, he would have expected to find evidence of blood, but did not find any. Moreover, the medical examiner had found no evidence of blunt force trauma.

[6]As noted above, when the bodies were first discovered, the detectives noted that the door to the back (porch door) was locked by a deadbolt from the inside.

[7]The two statements signed by the defendant and the addendum were admitted at trial.

[8]There was evidence tending to show that the defendant remained within the city of Springfield from July 4 until the time of his arrest. He admitted that he never told anyone, even anonymously, that his child was alone in the apartment.

*the murder of the child.* In reviewing a denial of a motion for a required finding, we consider the evidence in its light most favorable to the Commonwealth to determine whether it was sufficient to permit a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). "The relevant question is whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 (1992). The Commonwealth proceeded on the theory that, because the defendant intentionally abandoned his infant daughter in circumstances that he reasonably would have known would result in her death, the jury could reasonably have inferred the malice required for conviction of murder in the first degree on a theory of extreme atrocity or cruelty.[9] The defendant asserts that, because the windows facing the street were open and the door providing access from the building's common hallway was unlocked, the evidence was sufficient to prove only that he was guilty of wilful and wanton conduct amounting to involuntary manslaughter by abandoning the child without care.

The evidence at trial was sufficient to permit a jury to find the defendant guilty of murder in the first degree. The defendant concedes that he left his twenty-two month old child alone with her dead or dying mother in an apartment in the July heat without care, and that he took no steps to alert anyone to the child's plight. The evidence supports a finding that the apartment door and accessible windows were locked. "The jury could have found on the . . . evidence that the baby died of starvation and dehydration resulting from the intentional conduct of the defendant in placing it [in isolation] and withholding food and liquids from it." *Commonwealth* v. *Hall*, 322 Mass. 523, 527-528 (1948).[10] Based on the expert testimony, the jury could also have found that, during the days the child would

[9]"The only theory of murder in the first degree to which the third prong of malice applies is extreme atrocity or cruelty." *Commonwealth* v. *Judge*, 420 Mass. 433, 442 (1995).

[10]The defendant asserts that *Commonwealth* v. *Hall*, 322 Mass. 523 (1948), in which we upheld a conviction of murder in the second degree in a child abandonment case, does not apply to the case at bar because "the circumstances were wholly dissimilar from those here at issue." We do not

have remained conscious prior to her death, she would have experienced a very high degree of suffering. "[T]he theory of extreme atrocity or cruelty does not have a requirement of specific intent. Rather, the determination whether an unlawful killing was perpetrated with extreme atrocity or cruelty 'focuses both on the defendant's actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim, in terms of the extent of physical injury and the degree of suffering endured.' " *Commonwealth* v. *Judge*, 420 Mass. 433, 442 (1995), quoting *Commonwealth* v. *Lacy*, 371 Mass. 363, 367 (1976).

The judge's charge to the jury on involuntary manslaughter included a careful explanation of "[t]he difference between th[e] third form of malice [that a plain and strong likelihood of death would follow] and wanton and reckless conduct which would amount to involuntary manslaughter." The jury were made well aware that "[a] fine line distinguishes murder based on the third prong of malice from the lesser included offense of involuntary manslaughter." *Commonwealth* v. *Woodward*, 427 Mass. 659, 669 (1998). We conclude that the evidence presented was sufficient to permit a rational jury to find beyond a reasonable doubt that the defendant had, as to his child, committed murder in the first degree with extreme atrocity or cruelty.

3. *Use of prior bad acts evidence.* At trial, over the defendant's objection, the judge admitted evidence of prior incidents of violent conduct by the defendant toward the victim, all of which had occurred within fifteen months of the murder.[11] The defendant argues that this was error because the central is-

read the *Hall* case so narrowly. See *Simpkins* v. *State*, 88 Md. App. 607, 617-618 (1991), citing *Commonwealth* v. *Hall, supra.* See generally Annot., Homicide by Withholding Food, Clothing, or Shelter, 61 A.L.R.3d 1207 (1975). The *Simpkins* court concluded that "[w]here a young child, incapable of self-help, is knowingly, deliberately, and unnecessarily placed in confinement and left alone for up to five days without food, drink, or attention and death ensues from that lack, malice may be inferred." *Id.* at 620. Both the Commonwealth and the defendant acknowledge that many seemingly applicable cases from other States have limited usefulness, because of important differences in the wording of their respective malice statutes. The *Simpkins* decision, however, appears to be largely based on the common law, including our *Hall* decision.

[11]Witnesses testified that in April, 1995, there was an incident in which the

sue at trial was whether his three signed statements, and his reported oral admission that he "did it" and "choked" the victim, were genuine, truthful, and offered voluntarily. The defendant further argues that if motive were at all an issue, it was amply demonstrated by evidence from two witnesses that the defendant had reported a conflict with the victim at the approximate time of her death. Therefore, the defendant reasons, evidence of past physical abuse was only marginally relevant and the judge exceeded her discretion in admitting it, because it was too remote in time, unnecessarily inflammatory and its prejudicial effect greatly outweighed its materiality.

The evidence was properly admitted to show the defendant's state of mind, motive, intent, and relationship with the victim, all live issues at trial. See *Commonwealth* v. *Leonardi*, 413 Mass. 757, 762-764 (1992) (admitting defendant's prior bad acts against girl friend for relevant probative purposes). The judge correctly exercised her discretion in weighing the probative value of this evidence against its prejudicial effect. See *Commonwealth* v. *Fordham*, 417 Mass. 10, 22 (1994), and cases cited ("Evidence that has relevance to issues other than bad character or criminal propensity is admissible if not outweighed by its unfair prejudice, which is a determination for the judge to make and one which we do not disturb unless, in our judgment, it is palpably wrong"); *Commonwealth* v. *Robertson*, 408 Mass. 747, 751 (1990) ("The evidence of prior violence by the defendant toward the victim[] also further demonstrated to the jury the full nature of the relationship between the defendant and the victim[]"); *Commonwealth* v. *Gil*, 393 Mass. 204, 216

defendant solicited two female friends to administer a beating to the victim. The defendant watched this beating and then kicked the victim in the head as she lay bleeding on the sidewalk and screaming for her baby. In a later incident that same month, the defendant offered his cousin forty dollars to "fight" the victim. In October, 1995, a security guard responded to an argument between the victim and the defendant outside her apartment building. The guard observed that the victim's hands were bleeding and that she was crying. She told the guard that the defendant had hit her with a baby stroller. The defendant threatened to return later with a gun to retrieve his daughter. On July 2, 1996, shortly before the murders, the defendant asked a female relative to, "Go beat that bitch's ass." On July 5, the defendant told a woman in the neighborhood that he had spent the night in jail because of an argument with the victim that resulted in her calling the police.

(1984) (evidence of continuing animosity between defendant and victim spouse relevant on issue of motive to kill).

While "[t]here is no bright-line test for determining temporal remoteness of evidence of prior misconduct," *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 n.13 (1986), the time period at issue here falls well within a range we have found acceptable. See, e.g., *Commonwealth* v. *Jordan (No. 1)*, 397 Mass. 489, 492 (1986) (judge did not err in admitting evidence of beatings and mistreatment of victim by defendant from five to seven months prior to events on which indictments were based); *Commonwealth* v. *Little*, 376 Mass. 233, 238 (1978) (judge did not err in allowing evidence that defendant, two years earlier, had pistol-whipped another man as "lesson" to victim).

Finally, the judge correctly gave limiting instructions both when the evidence was presented at trial and in her charge, stating that the evidence was admitted only on the issue of the defendant's state of mind and intent toward the victim, and not for its full probative value.[12] There was no error entitling the defendant to a new trial.

4. *Jury instructions.* The judge instructed the jury on murder in the first degree with extreme atrocity or cruelty as to both the victim and her child, and on murder in the first degree based on deliberate premeditation as to the victim alone.[13] The judge charged the jury on murder in the second degree as to both; on voluntary manslaughter as to the victim, and on involuntary manslaughter as to the child. The defendant alleges several er-

---

[12]The judge stated in the final charge to the jury: "Let me start by saying you heard evidence during the trial that [the defendant] may have struck or committed an assault and battery upon [the victim] some months before July 1996. You've also heard some testimony that [the defendant] asked or encouraged other persons, other women, to beat . . . [the victim]. Bear in mind, [the defendant] is not on trial for any act or conduct other than the two charges which are before you. It's very important that you not consider this evidence, the prior beatings or the evidence respecting any request he may have made of other persons. You may not consider this evidence as proof that [the defendant] has a criminal personality or a bad character. You absolutely must not use this evidence as any proof that [the defendant] committed the offense of which he stands accused. As I instructed you earlier during this trial, and it's important that I reemphasize and that you note this point, you may consider this evidence only on the issue of [the defendant's] intent toward [the victim]."

[13]The jury did not convict the defendant of murder in the first degree by reason of premeditation.

rors in these instructions. No objection was made at trial. Thus, we review the challenged instructions to determine whether they contain error, and if so whether there is a "substantial likelihood that a miscarriage of justice occurred." *Commonwealth* v. *Vinton*, 432 Mass. 180, 188 (2000). See *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998).

a. *Instruction on provocation with regard to the mother's death*. At trial, the judge correctly determined that the evidence here required an instruction on provocation as to the mother's death. *Commonwealth* v. *Carlino*, 429 Mass. 692, 694 (1999). *Commonwealth* v. *Acevedo*, 427 Mass. 714, 715 (1998). The defendant argues correctly that because there was evidence of provocation here, the burden was on the Commonwealth to prove the *absence* of provocation beyond a reasonable doubt. *Commonwealth* v. *Whitman*, 430 Mass. 746, 751 (2000). The judge in the instant case correctly defined voluntary manslaughter. She then erred in assigning the burden of proof:

> "For voluntary manslaughter, the prosecution must have proved the following three elements beyond a reasonable doubt: First, that Mr. Fickling inflicted an injury upon [the victim] from which she died. *Second, that he injured [the victim] as a result of sudden combat or in the heat of passion* . . . Third, that he committed the homicide or he committed the killing unlawfully, without legal justification or excuse." (Emphasis supplied.)

This language closely matches that which we found erroneous in *Commonwealth* v. *Acevedo, supra* at 716.[14] See *Commonwealth* v. *Little*, 431 Mass. 782, 787 (2000); *Commonwealth* v. *Carlino, supra* at 694. In effect, the judge "incorrectly told the jury that malice is negated by provocation only if provocation is proved beyond a reasonable doubt. The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth

---

[14]The case at bar was tried in 1997, prior to our decision in *Commonwealth* v. *Acevedo*, 427 Mass. 714 (1998). However, we have noted previously that the holding in *Acevedo* was stated in substantially similar terms in *Commonwealth* v. *Boucher*, 403 Mass. 659, 663 (1989). *Commonwealth* v. *Carlino*, 429 Mass. 692, 695 n.1 (1999).

must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation." *Commonwealth* v. *Acevedo, supra,* citing *Commonwealth* v. *Boucher,* 403 Mass. 659, 661 (1989).

Here, the judge went on to instruct correctly that "[w]here there is evidence of provocation, the prosecution has the burden of proving beyond a reasonable doubt that [the defendant] did not act in the heat of passion." Following further discussion of the required elements of voluntary manslaughter, the judge then made a point of emphasizing the correct instruction: "*Again,* the prosecution has the burden of proving beyond a reasonable doubt that [the defendant] did not act in the heat of passion or sudden provocation. *You may not return a verdict of guilty unless the prosecution has met this burden*" (emphasis supplied). This is followed by a final instruction on voluntary manslaughter that repeats the original error.

The defendant argues that the potential confusion caused by these instructions entitles him to a new trial as to his conviction in the victim's death. He asserts that the United States Supreme Court decision in *Francis* v. *Franklin,* 471 U.S. 307, 322 (1985), is controlling here:

> " 'Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity' because '[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.' "

*Commonwealth* v. *Repoza,* 400 Mass. 516, 519, cert. denied, 484 U.S. 935 (1987), quoting *Francis* v. *Franklin, supra.* The defendant reads the *Francis* decision too selectively. The passage relied on by the defendant is immediately preceded and qualified by the United States Supreme Court's prefatory observation that "[n]othing . . . in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other." *Id.* at 322. In the instant case, in contrast, the judge emphasized that "[y]ou may not return a verdict of guilty of murder unless the prosecution has met this burden," that is, "of proving beyond a reasonable doubt that [the defendant] did not act in the heat of passion or sudden provocation." Here we have two correct instructions on the

Commonwealth's burden of proof on provocation sandwiched between two incorrect instructions. But the two correct instructions make it clear to the jury, as *Francis* v. *Franklin, supra,* requires, that those instructions carry more weight than the two incorrect ones. So while the inclusion of incorrect instructions here is far from ideal, we nevertheless cannot conclude that "the center of gravity of the provocation instructions was strongly on the side of misstatement." *Commonwealth* v. *Acevedo, supra* at 717. "Reviewing the whole charge, including the judge's emphatic and repeated statements that only the Commonwealth — and never the defendant — bore any burden, we believe that the jury could not have concluded that the judge's misstatement created an unconstitutional presumption relieving the State of its burden of persuasion beyond a reasonable doubt of every element of [the crime charged]." *Commonwealth* v. *Torres,* 420 Mass. 479, 490-491 (1995).[15] These instructions do not create a substantial likelihood of a miscarriage of justice.

b. *Instruction on malice aforethought with respect to both victims.* The defendant also alleges error in the judge's instructions on malice aforethought, focusing in particular on the following section:

> "Malice aforethought does not necessarily imply *ill will* towards the person killed. *Any* intentional killing of a human being without legal justification or excuse and with no extenuating circumstances sufficient in law to reduce the crime, for instance, to manslaughter, is malicious

---

[15]We have reached different outcomes in other cases where the charge taken as a whole was not adequate on this point. See *Commonwealth* v. *Acevedo, supra* at 716-717 (incorrect instruction on burden of proof as to provocation in main charge, then correct instruction, followed by incorrect instruction; erroneous instruction then repeated in supplemental charge). *Commonwealth* v. *McLaughlin,* 433 Mass. 558, 562 n.3 (2001) ("[h]ere, the pattern is an incorrect instruction, followed by a correct instruction in the main charge, followed by an incorrect instruction in the supplemental charge"); *Commonwealth* v. *Little,* 431 Mass. 782, 787-789 (2000) (main charge, oral supplementary instruction, and written supplementary instruction all incorrect); *Commonwealth* v. *Carlino, supra* at 694-695 (erroneous instruction accompanied by no correct instruction); *Commonwealth* v. *Grant,* 49 Mass. App. Ct. 169, 173 (2000) ("here the one correct instruction on the Commonwealth's burden of proof on provocation in the judge's final instructions to the jury at the close of evidence was sandwiched between two incorrect instructions").

within the meaning of malice aforethought" (emphasis supplied).

The defendant claims that this instruction was incorrect because it was "overbroad," and "could have led the jury to conclude that any intentional act resulting in the death of another person was malicious unless extenuating circumstances were present." We are not persuaded. Immediately following the challenged portion of the instructions, the judge properly defined malice aforethought as including "a *specific* intent to kill the victim or a *specific* intent to do her grievous bodily harm" (emphasis supplied). The judge then goes on to define carefully "specific intent" for the jurors, and uses that term no fewer than five times.[16] Further, the judge repeatedly emphasized that the burden was on the Commonwealth to prove each element of the crime charged, including specific intent. See *Commonwealth* v. *Ferreira*, 417 Mass. 592, 598 (1994). This is not "overbroad."

As for the use of "ill will" language in the judge's instruction, the defendant correctly notes that we have disapproved such language since our decision in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995), where we declared that such phrasing "is not helpful and ought in the future to be omitted."[17] However, this single use of the term "ill will" is followed by repeated, correct definitions of malice, including the third prong relevant to murder with extreme atrocity or cruelty: "malice aforethought may also include having an unexcused intent to

---

[16]The judge· uses the term "specific intent" once again when charging the jury on the specific elements, including malice aforethought, required to prove the defendant guilty of murder in the first degree with extreme atrocity or cruelty.

[17]We further explained: "The language is not helpful, for example, because it may focus the jury on the need for proof of some special animosity that the defendant harbored toward the· victim, when the relevant inquiry is the defendant's intent to kill or do grievous bodily harm, or the defendant's knowledge of circumstances which would indicate to a reasonably prudent person that the conduct in question would likely cause death; or because it may lead the jury to believe that anger, hatred, revenge or a selfish, wrongful mood is enough to show malice. The term 'malice' should be defined by reference to the three prongs described in *Commonwealth* v. *Grey*, *supra*, with such additional explanation as may be appropriate to the understanding of those concepts." *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995).

commit an act which creates a plain and strong likelihood that death will follow."[18] While we continue to discourage the use of "ill will" or "state of mind" language, "we have said that instructions on malice that include both the three prong definition and an obsolete definition adequately convey the meaning of malice to the jury." *Commonwealth* v. *Murphy,* 426 Mass. 395, 401 (1998), and cases cited. We conclude that there is no error in these instructions that creates a substantial likelihood of a miscarriage of justice.

5. *G. L. c. 278, § 33E.* We have reviewed the entire record of the defendant's trial pursuant to G. L. c. 278, § 33E, and we see no basis for exercising our authority to reduce the jury's verdicts or to order a new trial.[19]

*Judgments affirmed.*

---

[18]While the defendant concedes that the judge "ultimately restated the government's burden to prove malice and referred again to its three prongs, [he argues that] any remedial effect was undercut when she prefaced those instructions with the equivocal introduction, 'in this particular case, as I said, malice aforethought *may be considered* on those three — in those three separate forms' " (emphasis in defendant's brief). We are not persuaded. Heard in context, we believe it would have been clear to the jury that the term "may" as used by the judge here refers to the making of an appropriate choice among the three prongs of malice, and *not* to a choice as to whether malice aforethought "may" constitute an element of the crime of murder, as the defendant's argument implies. In fact, the defendant omits the last portion of the challenged sentence of the judge's instructions, in which she stated that malice, regardless of the form, "*must* be proved beyond a reasonable doubt." See *Commonwealth* v. *Niemic,* 427 Mass. 718, 720 (1998), quoting *Commonwealth* v. *Sellon,* 380 Mass. 220, 231-232 (1980) ("In support of his argument, the defendant 'parses the charge and attacks it piecemeal. We, however, must view the charge in its entirety since the adequacy of instructions must be determined in light of their overall impact on the jury' ").

[19]The defendant argues that, even if this court concludes that in the circumstances of this case his abandonment of his daughter could be found to be malicious, we should exercise our authority under G. L. c. 278, § 33E, to reduce the degree of that guilt to manslaughter, because the jury concluded he had not acted with premeditation, and thus his behavior here is "more consistent with the evidence that he acted out of panic, fear, and ignorance than that he harbored malice." However, "[e]xtreme atrocity or cruelty requires the jury to consider the defendant's actions and their effect on the victim, *but does not require that the defendant be aware of how shocking his actions were or how much suffering his conduct caused the victim*" (emphasis added). *Commonwealth* v. *Judge, supra* at 442, and cases cited.